No. 24-30359

# In the United States Court of Appeals for the Fifth Circuit

STATE OF LOUISIANA; STATE OF MISSOURI; STATE OF ARKANSAS; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF KANSAS; COMMONWEALTH OF KENTUCKY; STATE OF MISSISSIPPI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF UTAH; STATE OF WEST VIRGINIA; STATE OF ALABAMA; STATE OF INDIANA; STATE OF WYOMING,

*Plaintiffs-Appellants*,

v.

MERRICK GARLAND, in his official capacity as Attorney General of the United States; U.S. DEPARTMENT OF JUSTICE; MARY CHENG, in her official capacity as Acting Director of Executive Office of Immigration Review; EXECUTIVE OFFICE OF IMMIGRATION REVIEW; ALEJANDRO MAYORKAS, in his official capacity as Secretary of the U.S. Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, in his official capacity as Senior Official Performing the Duties of the Commission of the U.S. Custom and Border Protection; U.S. CUSTOMS AND BORDER PROTECTION; PATRICK J. LECHLEITNER, in his official capacity as Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; UR. M. JADDOU, in his official capacity as Director of U.S. Citizenship and Immigration Services; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; RAUL ORTIZ, in his official capacity as Chief of United States Border Patrol; UNITED STATES BORDER PATROL; UNITED STATES OF AMERICA

*Defendants-Appellees*,

_____

On Appeal from the United States District Court
for the Western District of Louisiana
No. 6:22-cv-01130

_____

—————————————————

## APPELLANTS' OPENING BRIEF

—————————————————

ELIZABETH B. MURRILL
Attorney General of Louisiana

J. BENJAMIN AGUIÑAGA
Solicitor General

ZACHARY FAIRCLOTH
Principal Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. Third Street
Baton Rouge, LA 70802
(225) 326-6705
FairclothZ@ag.louisiana.gov

*(Additional counsel listed in signature block)*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required here because, under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants—as "governmental" parties—need not furnish a certificate of interested persons.

/s/ Zachary Faircloth
ZACHARY FAIRCLOTH

## STATEMENT REGARDING ORAL ARGUMENT

The States respectfully request oral argument because it would aid the Court's decision-making process, particularly in light of the complexities of the Asylum Rule at issue and the more than 13,000-page record on appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT ..................................ii

TABLE OF CONTENTS ........................................................... iii

TABLE OF AUTHORITIES...................................................... v

INTRODUCTION.................................................................... 1

JURISDICTIONAL STATEMENT ............................................... 4

ISSUE PRESENTED ............................................................... 5

STATEMENT OF THE CASE .................................................... 6

    A.    *Statutory Background.* ......................................... 6

    B.    *The Asylum Interim Final Rule.* ....................... 10

    C.    *Procedural Background* .................................... 13

SUMMARY OF THE ARGUMENT .............................................15

LEGAL STANDARD .............................................................. 16

ARGUMENT ........................................................................ 18

I.   THE DISTRICT COURT FAILED TO RECOGNIZE
    THE STATES' INJURIES-IN-FACT.......................................... 19

    A.   *The States Suffer Classic Monetary*
        *Injuries-in-Fact From the Asylum Rule.* ................... 19

       1.   The Asylum IFR Increases the States' Costs
           Associated With Illegal Immigration.....................21

  2. The Asylum IFR Increases the States'
    Costs from Public Benefits to Asylees............................30

 B. *The Supreme Court's Narrow* Priorities *Decision*
   *Has No Bearing on The States' Injuries*.................................34

II. THE DISTRICT COURT ERRED IN REQUIRING
  THE ASYLUM IFR BE THE SOLE CAUSE OF
  INCREASED ILLEGAL IMMIGRATION. ............................................36

III. THE STATES' INJURIES ARE REDRESSABLE BY THE COURT. ...........39

CONCLUSION .................................................................................41

CERTIFICATE OF SERVICE .........................................................45

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright,*
468 U.S. 737 (1984) ............................................................. 36

*Arizona v. United States,*
567 U.S. 387 (2012) ............................................................. 18

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................. 38

*Crocker v. Austin,*
115 F.4th 660 (5th Cir. 2024) ............................................. 18

*Czyzewski v. Jevic Holding Corp.,*
580 U.S. 451 (2017) ............................................................. 33

*Dep't of Com. v. New York,*
588 U.S. 752 (2019) ................................................. 36, 37, 40

*DHS v. Texas,*
No. 23A607, 2024 WL 222180 (U.S. Jan. 22, 2024) ............ 27

*DHS v. Thuraissigiam,*
140 S. Ct. 1959 (2020) ........................................................ 33

*FEC v. Cruz,*
596 U.S. 289 (2022) ............................................................. 18

*Florida v. Mayorkas,*
672 F.Supp.3d 1206 (N.D. Fla. 2023) ................................. 27

*Food and Drug Administration v.*
*Alliance for Hippocratic Medicine,*
602 U.S. 367 (2024) ................................................. 20, 36, 39

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ............................................................. 40

*Gen. Land Office,*
71 F.4th at 272 (5th Cir. 2023) ................................. 2, 17, 19

*General Land Office v. Biden,*
71 F.4th 264 (5th Cir. 2023) ............................................... 22

*Kaufman v. Mukasey*,
    524 F.3d 1334 (D.C. Cir. 2008) ............................................................8

*Larson v. Valente*,
    456 U.S. 228 (1982) ...............................................................................39

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973) ...............................................................................35

*Louisiana v. Mayorkas*,
    No. 24-cv-1422 (W.D. La.) ......................................................................1

*Louisiana v. Nat'l Oceanic & Atmospheric Admin.*,
    70 F.4th 872 (5th Cir. 2023) ...............................................................20

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...................................................... 17, 20, 37, 39

*M.M.V. v. Garland*,
    1 F.4th 1100 (D.C. Cir. 2021) ..............................................................7

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ...............................................................................40

*Murthy v. Missouri*,
    603 U.S. 43 (2024) .................................................................................17

*NiGen Biotech, L.L.C. v. Paxton*,
    804 F.3d 389 (5th Cir. 2015) ...............................................................40

*Plyler v. Doe*,
    457 U.S. 202 (1982) .........................................................................18, 23

*Ramming v. United States*,
    281 F.3d 158 (5th Cir. 2001) ..........................................................16, 19

*Sanchez v. R.G.L.*,
    761 F.3d 495 (5th Cir. 2014) ...............................................................39

*State v. DHS*,
    88 F.4th 1127 (5th Cir. 2023) ..............................................................27

*State v. Rettig*,
    987 F.3d 518 (5th Cir. 2021) ...............................................................40

*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021) ...................................................... passim

*Texas v. Biden,*
  2021 WL 3603341 (N.D. Tex. Aug. 13, 2021) ....................................24

*Texas v. Biden,*
  554 F. Supp. 3d 818 (N.D. Tex. 2021)...........................................27, 31

*Texas v. DHS,*
  2023 WL 8285223 (W.D. Tex. Nov. 29, 2023)................................27

*Texas v. DHS,*
  722 F. Supp. 3d 688 (S.D. Tex. 2024) ..........................................20, 33

*Texas v. EEOC,*
  933 F.3d 433 (5th Cir. 2019) ...............................................................18

*Texas v. United States,*
  50 F.4th 498 (5th Cir. 2022) ...................................................... passim

*Texas v. United States,*
  787 F.3d 733 (5th Cir. 2015)......................................................2, 19, 20

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) ...................................................... passim

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) .....................6

*Tineo v. Ashcroft,*
  350 F.3d 382 (3d Cir. 2003) ...................................................................8

*United States v. Texas,*
  599 U.S. 670 (2023).......................................................20, 23, 34, 39

*Zadvydas v. Davis,*
  533 U.S. 678 (2001) ..............................................................................24

**Statutes**

5 U.S.C. § 701 ..............................................................................................4

5 U.S.C. § 706 ............................................................................................13

8 U.S.C. § 1101(a)(42)................................................................................9

8 U.S.C. § 1158(a)(1)..................................................................................7

8 U.S.C. § 1158(b)(1)(A)............................................................................9

8 U.S.C. § 1158(d)(5) ................................................................8

8 U.S.C. § 1182(d)(5) ........................................ 8, 11, 30, 33

8 U.S.C. § 1225(b)(1) .......................................... 7, 8, 12, 13

8 U.S.C. § 1229a(a)(3) .............................................................9

8 U.S.C. § 1252(a)(2) ................................................................8

28 U.S.C. § 1291 ........................................................................4

28 U.S.C. § 1331 ........................................................................4

28 U.S.C. § 1346 ........................................................................4

28 U.S.C. § 1361 ........................................................................4

## Other Authorities

Alicia Wallace, *America's inflation is getting back to normal.*
  *But price problems persist*, CNN (Oct. 10, 2024), t.ly/zkvmW ............29

Congress enacted the Illegal Immigration Reform and
  Immigrant Responsibility Act (IIRIRA), Pub. L. 104–208,
  September 30, 1996, 110 Stat. 3009........................................7

Interim Final Rule, 87 Fed. Reg. 18,078 (Mar. 29, 2022)............... passim

Miriam Jordan, *One Big Reason Migrants Are Coming in Droves*,
  New York Times (Jan. 31, 2024), t.ly/JafAb ......................................27

NPR, *American public schools face an existential enrollment crisis*
  (August 27, 2024), t.ly/Pmjol ...........................................................30

Presley Bo Tyler, *Louisiana population is decreasing.*
  *These factors are contributing to the decline*,
  (Oct. 21, 2024), t.ly/UnMLG ...........................................................30

Procedures for Credible Fear Screening and Consideration
  of Asylum, Withholding of Removal, and CAT Protection
  Claims by Asylum Officers,
  86 Fed. Reg. 46,906 (Aug. 20, 2021) ................................. 10, 19, 24, 31

The Homeland Security Act (HSA),Pub. L. No. 107-296 (2002), § 451(b) 8

U.S. Dep't of Justice, Exec. Off. for Immigration Review, *Policy*
  *Memorandum: Terminology* (July 23, 2021), t.ly/esBO4 ......................6

**Rules**

Fed. R. App. P. 4(a)(1)(B) ............................................................. 4

**Regulations**

42 C.F.R. § 440.255(c) ............................................................... 23

8 C.F.R. § 208.6 ...................................................................... 25

8 C.F.R. § 1003.10(b) ............................................................ 9, 12

8 C.F.R. § 208.9 ...................................................................... 12

**Constitutional Provisions**

Fla. Const. art. IX, § 1 ............................................................. 23

La. Const. art. VIII, § 13 ......................................................... 23

**INTRODUCTION**

In April 2024, a Chinese national illegally entered the United States with an extremely rare, aggressive, and drug-resistant form of tuberculosis. *See Louisiana v. Mayorkas*, No. 24-cv-1422 (W.D. La.). Three months later, DHS finally detained and transported the alien to ICE facilities in Louisiana. *Id.* Despite the infected alien coming in contact with over 200 other detainees—and untold numbers of non-detainees—the federal government hinted that a grant of asylum or parole would trump the Louisiana Surgeon General's quarantine orders. *Id.* The State had to seek judicial intervention to ensure the federal government could not release the disease onto Louisiana's streets. *Id.* The moral? No one can seriously dispute that States bear real costs of disastrous border policies. And those very real costs confer Article III standing.

This case involves a challenge by eighteen States against the federal government's Asylum Interim Final Rule (IFR), which fundamentally undermined the statutory framework for asylum claims in the United States. Beginning in May 2022, it bypassed immigration judges in favor of "nonadversarial" asylum officers in the adjudication of

asylum claims for aliens subject to removal. These changes also unlawfully sidestep Congress's prescribed procedures, undermining both the Immigration and Nationality Act (INA) and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA).

In the district court's words: "the Executive Branch [] acted unlawfully in issuing the Asylum IFR." ROA.12910. The court nevertheless held that the States lack Article III standing to challenge the Asylum IFR. ROA.12892–12931. That was reversible error.

The district court's analysis improperly overlooked well-established precedents from this Court and the Supreme Court confirming that States have standing based on fiscal injuries stemming from federal immigration policies. *See Gen. Land Office*, 71 F.4th at 272 (5th Cir. 2023); *see also, e.g.*, *Texas v. United States*, 787 F.3d 733, 748–49 (5th Cir. 2015) ("*Texas DAPA I*"); *Texas v. United States*, 50 F.4th 498, 517–518 (5th Cir. 2022) ("*Texas DACA*"). The district court also mistakenly applied an overly stringent standard of causation, mandating the States prove other policies *did not* cause the massive influx of illegal immigrants. That is an impossible burden, and one rejected by this Court time and again. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021)

("*Texas MPP II*"), *rev'd and remanded on other grounds*, 597 U.S. 785 (2022). This Court should reverse the district court's flawed ruling and remand for further proceedings.

**JURISDICTIONAL STATEMENT**

The district court had jurisdiction over the States' claims under 5 U.S.C. §§ 701–06 and 28 U.S.C. §§ 1331 1346, 1361. On April 16, 2024, the district court dismissed the claims for lack of jurisdiction, ROA.12930, and entered judgment accordingly the same day, ROA.12931. The States timely filed a notice of appeal on June 7, 2024. ROA.12932; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

**ISSUE PRESENTED**

Whether the district court improperly dismissed the States' Administrative Procedure Act claims for lack of jurisdiction for lack of standing where the Rule increases illegal immigration and expedites access to state-funded public benefits for asylees under an unlawful process.

## STATEMENT OF THE CASE

This Court is well-acquainted with removal proceedings, so the States recount here just the critical statutory background, the implementation of the challenged rule, and the facts pertinent to the States' standing stemming from that challenged rule.

### A. Statutory Background.

An alien can claim asylum in the United States through two statutorily recognized methods: "affirmative asylum" or "defensive asylum." ROA.451–453.[1] For affirmative asylum, the alien appears before a U.S. Citizenship and Immigration Services (USCIS) asylum officer for a nonadversarial interview. *See* ROA.451–453. For defensive asylum, the alien appears before an Executive Office of Immigration Review (EOIR) immigration judge in an adversarial proceeding. *See* ROA.451–453. This case concerns an agency action that end-runs the statutorily prescribed defensive asylum process for aliens subject to removal proceedings.

---

[1] Like the district court, this brief uses the statutory term "alien." ROA.12895; *Texas v. United States*, 809 F.3d 134, 148 n.14 (5th Cir. 2015), *as revised* (Nov. 25, 2015); *contra* U.S. Dep't of Justice, Exec. Off. for Immigration Review, *Policy Memorandum: Terminology* (July 23, 2021), t.ly/esBO4.

In 1996, prompted by concerns over increased border crossings and abuses of the asylum process, ROA.12120, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. 104–208, September 30, 1996, 110 Stat. 3009. Among other things, IIRIRA mandated expedited removal proceedings for "inadmissible" aliens—those who are apprehended after attempting to enter the United States illegally. 8 U.S.C. § 1225(b)(1)(A)(i). Those inadmissible aliens would, however, still be eligible to apply for asylum, provided they adhered to specific statutory procedures and conditions. 8 U.S.C. § 1225(b)(1)(A)(i) (citing *id.* § 1158(a)(1)); *see M.M.V. v. Garland*, 1 F.4th 1100, 1104–05 (D.C. Cir. 2021) (describing the process). And Congress mandated defensive asylum proceedings as that specific statutory procedure. 8 U.S.C. § 1225(b)(1). Today, most aliens encounter the asylum system exclusively through defensive asylum applications in tandem with their removal proceedings. ROA.470.

IIRIRA's process works like this: If an alien subject to removal claims asylum, an asylum officer must interview the alien and determine if he has a "credible fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(ii), (B)(ii). Since 2002, the Department of Homeland Security's USCIS has

assumed the initial-credibility-determination role. *See* The Homeland Security Act (HSA), Pub. L. No. 107-296 (2002), § 451(b). And their determinations remain subject to review by an immigration judge from the Department of Justice's EOIR. 8 U.S.C. § 1225(b)(1)(B)(iii)(III); *see Kaufman v. Mukasey*, 524 F.3d 1334, 1338 (D.C. Cir. 2008) ("the Attorney General has authority over certain immigration functions specifically relating to immigration courts").

If neither the asylum officer nor the immigration judge finds credible fear, the alien must be "removed from the United States without further hearing or review." 8 U.S.C. §§ 1225(b)(1)(B)–(C), 1252(a)(2), (e)(2). If credible fear is found, the alien undergoes a background check, *id.* § 1158(d)(5), and is placed in full removal proceedings before an immigration judge, *id.* § 1225(b)(1)(B)(ii). During the meantime, the alien "shall be detained for further consideration of the application for asylum." *Id.*; *see Tineo v. Ashcroft*, 350 F.3d 382, 398 (3d Cir. 2003) (describing § 1225 as a "de facto mandatory detention regime"). There is one exception for mandatory interim detention, which allows release only "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.* § 1182(d)(5)(A).

The full removal proceeding before an immigration judge serves as the "sole and exclusive procedure" for adjudicating such asylum claims. 8 U.S.C. § 1229a(a)(3). During the adversarial hearing, "[i]mmigration judges shall … interrogate, examine, and cross-examine aliens and any witnesses." 8 C.F.R. § 1003.10(b). And the alien bears the burden of proof to establish, *inter alia*, a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1158(b)(1)(A) (citing *id.* § 1101(a)(42)); *see generally id.* § 1158 (listing other statutory bars, exclusions, and conditions for a grant of asylum). Only upon satisfying these criteria can an immigration judge grant asylum.

Based on historical data, just 14% of apprehended aliens are granted asylum by an immigration judge. ROA.11886. According to EOIR statistics aggregated from fiscal years 2008 to 2019, of every 100 aliens who claimed credible fear, USCIS made positive determinations for 81 of them, and only two negative determinations were overturned by an immigration judge. ROA.11886. Out of those 83, only 45 timely filed an asylum claim to proceed before an immigration judge—and of those, only 14 were ultimately granted asylum. ROA.11886. Thus, of the 81 that

USCIS officers believed had a credible fear of persecution, immigration judges ultimately granted asylum to just 14, a success rate of 17.3% for defensive asylum applicants. ROA.11886.

**B. The Asylum Interim Final Rule.**

In August 2021, Defendants issued a Notice of Proposed Rulemaking (NPRM) that circumvents Congress's statutory procedures for adjudicating removal-eligible asylum claims. *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46,906 (Aug. 20, 2021). The NPRM was marketed as promoting "efficient … adjudication" and "expeditious grants" of asylum. 86 Fed. Reg. at 46,923. Louisiana, along with sixteen other states, vehemently objected to the proposed rule at the time. ROA.12054–12072.

Ignoring these and others' objections, Defendants published the Interim Final Rule ("Asylum IFR" or "Rule"), and declared it effective May 2022. 87 Fed. Reg. 18,078 (Mar. 29, 2022). The Asylum IFR broadcasted to potential migrants a commitment to "equity, human dignity and fairness" that bound the federal government to "reduc[e] [their] undue delays," to permit them to "enter the work force sooner,"

and to ensure they realize "cost savings" along the way. 87 Fed. Reg. at 18,088, 18,202–18,206, 18,211–18,213.

The Asylum IFR "profoundly changes the asylum procedures and standards," ROA.12906, in two significant ways. *First*, it broadens parole eligibility to any alien subject to expedited removal. 87 Fed. Reg. at 18,082, 18,108. This Court previously halted similar attempts, noting that "[d]eciding to parole aliens *en masse* is the opposite of [the] *case-by-case* decision-making" required by Section 1182(d)(5)(A). *Texas v. Biden*, 20 F.4th 928, 942 (5th Cir. 2021) ("*MPP I*").

*Second*, the Asylum IFR introduces a novel procedural step, shifting discretion to USCIS asylum officers to summarily decide defensive asylum claims through non-adversarial "Asylum Merits Interviews" without the usual adversarial safeguards. 87 Fed. Reg. at 18,082, 18,085, 18,089, 18,096. That novel shift carries a few major consequences:

**(1)** The IFR treats the "written record of" a "positive credible fear determination" as an "application for asylum," thus beginning the 180-day clock towards work authorization. 87 Fed. Reg. at 18,085, 18,090, 18,097, 18,138–18,139. While in 2019 just 45 of 83 aliens with a credible

fear finding even applied for asylum, the Rule now signs up the other 38 automatically. *See* 87 Fed. Reg. at 18,197.

**(2)** The IFR undercuts the adversarial removal proceeding. 87 Fed. Reg. at 18,096. Gone are the alien's burden of documentary proof, 87 Fed. Reg. at 18,144; the American people's right to representation, 87 Fed. Reg. at 18,078; and the immigration judge's obligation to "interrogate, examine, and cross-examine aliens and any witnesses," 8 C.F.R. § 1003.10(b). What remains is a cooperative endeavor—akin to affirmative asylum, 8 C.F.R. § 208.9—between the asylum officer and the alien to see if they can meet the statutory requirements "in a fair and sensitive manner." *See* 87 Fed. Reg. at 18,078.

**(3)** "Asylum Merits Interviews" operate as a one-way ratchet. That is principally because negative determinations are still subject to *de novo* review by an IJ. 87 Fed. Reg. at 18,098. And an interview can never end in removal because asylum officers still lack removal power—vested solely in immigration judges. *See* 8 U.S.C. § 1225(b). So asylum grants are expedited at the expense of delaying supposedly expedited removals. 87 Fed. Reg. at 18,203 ("[o]ne result of this rule is that asylum applications for some individuals pursuant to this rule could be granted

asylum earlier"). Indeed, even assuming any appeal is then "streamlined" to be governed by "special procedural rules," 87 Fed. Reg. at 18,078, other pressing expedited removal proceedings are necessarily leapfrogged and further delayed.

At its core, the Asylum IFR is a total affront to Congress's clear mandate in 8 U.S.C. § 1225. It supplants Congress's immigration procedures with the agencies' preferences and shifts Congress's specific delegations power willy-nilly between agencies. Indeed, as the district court itself agreed, "nowhere in § 1225(b) did Congress expressly grant the Executive Branch this authority." ROA.12906.

### C. Procedural Background

In April 2022, twenty states sued Attorney General Garland, Secretary Mayorkas, and other immigration agencies and officials. ROA.58–112; ROA.291–352 (First Amended Complaint); ROA.2179–2249 (Second Amended Complaint).[2] The States seek declarations that the Asylum IFR is unlawful, postponement of the Asylum IFR under 5 U.S.C. § 705, and vacatur of the Asylum IFR under 5 U.S.C. § 706. ROA.108–109.

---

[2] Though captioned as *Arizona v. Garland* below, Arizona voluntarily dismissed its claims on February 16, 2023. ROA.2308.

Defendants appeared and immediately asked for a stock-in-trade transfer to the District Court for the District of Columbia, ROA.248–277, which met with the States' opposition, ROA.353–369. At the same time, the States asked the trial court to postpone the effective date of the Asylum IFR, or alternatively, for a preliminary injunction. ROA.396–445; ROA.1094–1146 (corrected). Neither motion was definitively resolved then in favor of court-ordered limited jurisdictional discovery. ROA.2142–2146; ROA.2165–2178; ROA.2271. That limited jurisdictional discovery on the bellwether states of Louisiana and Florida spanned over a year until December 2023, when Defendants moved to dismiss the States' claims under Rules 12(b)(1) and 12(b)(6), ROA.8457–8511, which the States opposed. ROA.9188–9240.

In May 2024, notwithstanding the district court's conclusion that "the Executive Branch [] acted unlawfully in issuing the Asylum IFR," ROA.12910, it dismissed the suit for lack of jurisdiction, holding that Louisiana and Florida lacked Article III standing. ROA.12892–12931. This appeal follows.

## SUMMARY OF THE ARGUMENT

**I.** The States have standing arising from monetary injuries. Increased illegal immigration and increased asylum grants both lead to increased costs related to education, healthcare, crime, and public benefits on the States—a quintessential pocketbook injury under settled Fifth Circuit precedents. *See MPP II*, 20 F.4th at 971. *First*, as even the district court agreed, illegal immigration skyrocketed following the Asylum IFR's implementation. The predictable effect was the States absorbing additional expenses for healthcare, education, and other services. And Louisiana and Florida provided detailed evidence demonstrating these financial burdens. That alone is an Article III injury.

*Second*, the Asylum Rule extended the availability of public benefits like Medicaid and SNAP to asylees, which constitutes an independent injury to the States. The district court unduly focused on specific individual cost quantification, but, as this Court regularly recognizes, large-scale policies like the Asylum Rule are appropriately challenged through broader statistical evidence, as the States submitted here.

**II.** Those pocketbook injuries are fairly traceable to the Asylum Rule—especially at the pleading stage—because it plausibly leads to the increased immigration and asylum grants causing the States to pay those costs. Indeed, the Asylum IFR itself recognizes as much. That is sufficient for Article III causation.

The district court erred in demanding that the States also prove *other policies* do *not* contribute to increased illegal immigration. Indeed, many of the outgoing administration's policies do. But Fifth Circuit precedent teaches Plaintiffs are under no obligation to disaggregate injuries simply because they are multi-causal. Otherwise, the government could shield injurious policies from judicial review by couching them across multiple rules. That cannot be the law.

**III.** Finally, though unaddressed below, the States' injuries are also redressable, as a favorable ruling would effectively, even if partially, remedy their harms by setting aside the Asylum IFR and enjoining its implementation.

## LEGAL STANDARD

This Court reviews *de novo* a district court's dismissal under Rule 12(b)(1). *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

Dismissal is proper only "only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Id.*

Standing requires "an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015) ("*Texas DAPA II*") (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)), *aff'd by equally divided Court*, 579 U.S. 547 (2016). Those requirements are assessed as of the time the suit was filed. *See Gen. Land Office*, 74 F. 4th at 272 n.12. And plaintiffs must "support each element of standing with the manner and degree of evidence required at the successive stages of the litigation." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). "At the pleading stage," that means "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Gen. Land Off.*, 71 F.4th at 272 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

Moreover, in APA cases, there is a "basic presumption of judicial review," such that any "proper plaintiff aggrieved by final agency action may presumptively challenge that action in federal court." *Texas MPP II*, 20 F.4th at 971. Like in any case, "when considering whether a plaintiff has Article III standing, a federal court must assume arguendo the merits of his or her legal claim." *Crocker v. Austin*, 115 F.4th 660, 664 (5th Cir. 2024); *FEC v. Cruz*, 596 U.S. 289, 298 (2022) ("For standing purposes, we accept as valid the merits of [plaintiffs'] legal claims ...."); *see, e.g.*, *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019).

## ARGUMENT

It is axiomatic in the United States that "lax enforcement of the laws barring entry into this country ... results in the creation of a substantial 'shadow population' of illegal migrants—numbering in the millions—within our borders." *Plyler v. Doe*, 457 U.S. 202, 218 (1982). And it is States that "bear[] many of the consequences of [that] unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012).

For Article III standing, then, it is no surprise that this Court (and the Supreme Court) regularly recognize States suffer Article III injuries from the increase in the costs of social services traceable to a federal

policy's predictable influx of illegal immigrants into the State and expedited grant of public benefits. *See Gen. Land Office*, 71 F.4th at 272; *see also, e.g.*, *Texas DAPA I*, 787 F.3d at 748–49; *Texas DACA*, 50 F.4th at 517–518. For that reason, too, when an unlawful rule itself predicts increased illegal immigration and promises unlawful "expeditious grants" of asylum, 86 Fed. Reg. at 46,923, the causation standard embedded in Article III is satisfied, *see Texas MPP I*, 10 F.4th at 548. That is especially so for States, which receive special solicitude in the standing analysis. *See Texas DACA*, 50 F. 4th at 517.

Under these settled precedents, the States unquestionably have standing to proceed beyond the pleading stage. *See Ramming*, 281 F.3d at 161. The district court erred in concluding otherwise. The Court should reverse and remand.

# I. THE DISTRICT COURT FAILED TO RECOGNIZE THE STATES' INJURIES-IN-FACT.

## A. The States Suffer Classic Monetary Injuries-in-Fact From the Asylum Rule.

The district court erred by failing to apply this Circuit's controlling, commonsense standing analysis. An injury-in-fact must be both "concrete"—*i.e.* "real and not abstract," *TransUnion, LLC v. Ramirez,* 594

U.S. 413, 424 (2021)—and "particularized"—*i.e.* affecting "plaintiff in a personal and individual way," *Lujan*, 504 U.S. at 560 n.1. So "a monetary injury" is a "common example[]" that checks both boxes. *FDA v. Alliance for Hippocratic Medicine,* 602 U.S. 367, 381 (2024); *United States v. Texas*, 599 U.S. 670, 676 (2023) ("*Priorities*") ("Monetary costs are of course an injury.").

An injury must also be "actual or imminent—meaning that the injury must have already occurred or be likely to occur soon." *FDA*, 602 U.S. at 381 (citing *Clapper*, 568 U.S. at 410).

Applying these well-trodden principles, this Circuit has repeatedly held that States can establish Article III standing by pointing to additional costs to States resulting from an increased number of aliens present within their jurisdictions. *See, e.g.*, *Texas DAPA I*, 787 F.3d at 748–49; *Texas MPP II*, 20 F.4th at 968–969, 971. That injury is assessed relative to the status quo without the challenged federal policy. *Louisiana v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 881 (5th Cir. 2023); *see, e.g.*, *Texas v. DHS*, 722 F. Supp. 3d 688, 707 (S.D. Tex. 2024).

At the pleading stage, the States satisfied that standard by pointing to two distinct pocketbook injuries: (1) the growing education, healthcare, and policing costs of paroled illegal aliens in the States and (2) the rising direct benefit payments—like FITAP, SNAP, TANF, and Medicaid[3]—to putative asylees pushed expeditiously through to an unlawful form of asylum. Both are "strong bases for finding cognizable, imminent injury," *Texas MPP I*, 10 F.4th at 548, to which the district court paid only lip service.

### 1. The Asylum IFR Increases the States' Costs Associated With Illegal Immigration.

The Asylum IFR increases illegal immigration, and the States foot the bill. Texas's challenge to the elimination of the Migrant Protection Program is on all fours with this case. *See Texas MPP I*, 10 F.4th at 548; *Texas MPP II*, 20 F.4th at 966. There, a policy "ha[d] caused an increase in unlawful immigration into Texas." *Texas MPP I*, 10 F.4th at 548. The government's best standing defense was that the policy would not "cause[] either an increase in entries or an increase in parolees." *MPP II*, 20 F.4th at 969.

---

[3] The acronyms are for the Supplemental Nutrition Assistance Program (SNAP), the Temporary Assistance for Needy Families (TANF), and the Financial Independent Temporary Assistance Program (FITAP).

The Court rejected those arguments out of hand. Indeed, they were nonsensical given that illegal encounters had "skyrocketed" since the rule had taken effect. *Id.* at 968. That had a predictable result, given that DHS was "detaining at or near its capacity limits"—an increase in "the number of aliens released on parole into the United States, including Texas[.]" *Id.* at 966. The States' fiscal harms were then, of course, attributable "precisely [to] that increase" in illegal immigration. *Id.* at 968.

Also instructive is the Court's recent decision in *General Land Office v. Biden*, 71 F.4th 264, 268 (5th Cir. 2023), concerning the expenditure of funds for the "construction of [a] barrier system along the southwest border." Like in the *Texas MPP* cases, Texas asserted an injury from "costs" incurred "from the increase in unlawful migrants entering and remaining in the State." *Id.* at 271. Those "fiscal interests include[d] the additional costs of issuing driver's licenses, educating, providing healthcare, and criminal-justice processing." *Id.* Defendants did not so much as contest Texas's injury. For good reason: "such financial harms are readily cognizable and well-established in this court's precedents." *Id.* at 272 (citing *Texas DAPA II*, 809 F.3d at 155; *Texas MPP I*, 10 F.4th

at 547–48; *Texas MPP II*, 20 F.4th at 970–72; and *Texas DACA*, 50 F.4th at 517–19); *see United States v. Texas*, 599 U.S. 670, 680 n.3 (2023) (States "have standing to sue the United States or an executive agency or officer," especially when "federal policies frequently generate indirect effects on state revenues or state spending.").

That makes sense, as paroled illegal aliens cost the States money. In fact, "[f]ederal law affirmatively requires the States to make some of these expenditures" for illegal aliens present in the States. *Id.* at 969 (citing 42 C.F.R. § 440.255(c) (Emergency Medicaid)); *see Plyler*, 457 U.S. at 230 (mandating that States provide public education to school-age aliens not lawfully in the United States); *cf.* La. Const. art. VIII, § 13 (requiring public education); Fla. Const. art. IX, § 1 (same). And those costs are unquestionably *direct* pocketbook injuries felt by the States. *See Texas DACA*, 50 F.4th at 520 ("standing based on direct injury … that DACA inflicts pocketbook injuries on the State in the form of healthcare, education, and social services costs."). So when a federal policy or rule plausibly increases unlawful immigration and its costs fall on the States, the States have suffered an Article III injury sufficient to confer standing.

Here, the Asylum IFR has the same effect on aliens and the States as in the *Texas MPP*, *Texas DAPA*, *Texas DAPA*, and *General Land Office* cases. In fact, Defendants' rulemaking admitted as much. The predecessor NPRM promoted parole along with "efficient … adjudication" and "expeditious grants" of asylum. 86 Fed. Reg. at 46,923. And no one could seriously dispute that increasing the likelihood of an alien being released into the United States leads to an increase in the number of aliens attempting to enter illegally and thereby cash in on the federal government's new policy. *See Zadvydas v. Davis*, 533 U.S. 678, 713 (2001) (Kennedy, J., dissenting); *see also Texas v. Biden*, 2021 WL 3603341, at *6, *18–19 (N.D. Tex. Aug. 13, 2021).

For good measure, the States submitted evidence to that same effect. *See* ROA.10204–10208 (border patrol agent explaining these are "pull factors" that predictably lead to more illegal immigration). Indeed, as the retired chief of the border patrol put it, the Asylum IFR "would increase cross border flow unless they factored in detention or remain outside the country," so "anything that resulted in people getting released quicker would … increase the flow and we would not be able to … actually effectively patrol the border." ROA.10172; ROA.10219.

On this front, the district court, by all accounts, *agreed* that the evidence showed a predictable spike in illegal immigration following the Asylum IFR's implementation in May 2022. According to the court, encounters at the southern border ballooned during that time from 400,000 to 2,200,000 annually. ROA.12895.

The States also furnished just the sort of "big-picture evidence" to support their financial injury from that illegal immigration. *Texas MPP II*, 20 F.4th at 971; *see* ROA.11007–11022 (expert's analysis of "impact of the IFR"). Louisiana, for example, allocates a baseline of $4,015 per student, but provides an additional 22% per student to educate English Language Learner (ELL) students. ROA.9639. And as the States' expert explained, a State's ELL student population is often a "rough proxy" for immigrant student population, ROA.10540–10541, not least because DOJ threatens schools with lawsuits for tracking the immigration statuses of their students and parents, and a federal regulation prohibits disclosure of information about individuals with asylum claims, 8 C.F.R. § 208.6. Louisiana submitted evidence of more than 33,000 ELL students, with experts estimating that 6% of Louisiana

public school students are from alien households. ROA.9765–9766; ROA.11014–11017.

Florida similarly allocates a baseline of $4,587, but provides an additional 20.6% for each English as a Second Language Student. ROA.11013–11014. And Florida has over 116,000 immigrant students, with experts estimating that 31% of Florida public school students are from such households. ROA.9248–9251; ROA.11013–11014. On the healthcare front, too, Florida generally has anywhere from 3,000 to 8,000 aliens receiving emergency medical services every month, and Florida's share is anywhere from $1,000,000 to $6,000,000 *every month*. ROA.9497–9509; *see* 86 Fed. Reg. 67,479 (Nov. 26, 2021) (Federal Medical Assistance Percentage for Oct. 1, 2022 – Sept. 30, 2023).

Against the weight of the evidence, Defendants, at best, claim the Asylum IFR would not incentivize increased migration. *See* 87 Fed. Reg. at 18,194. But that is the same argument that the Court rejected in *Texas MPP II*, 20 F.4th at 968. Like there, DHS is "detaining at or near its capacity limits," and—like there—that leads to an increase in "the number of aliens released on parole into the United States," including Louisiana and Florida. *Id.* at 966. In fact, the Asylum IFR *requires*

increasing paroles. 87 Fed. Reg. at 18,082, 18,108. As a result, the States' fiscal harms are attributable "precisely [to] that increase" in illegal immigration. *Texas MPP II*, 20 F.4th at 968.

In all events, Defendants' conclusion is tough to square with the court's finding that encounters at the southern border ballooned during the relevant period from 400,000 to 2,200,000 annually—"a nearly 600 percent increase." ROA.12895; *see, e.g.*, *Florida v. Mayorkas*, 672 F.Supp.3d 1206, 1214 (N.D. Fla. 2023); *Texas v. DHS*, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023); *State v. DHS*, 88 F.4th 1127, 1130 (5th Cir. 2023), *vacated sub nom. DHS v. Texas*, No. 23A607, 2024 WL 222180 (U.S. Jan. 22, 2024).

Between the bloated border crossing numbers and the asylum backlogs, the only plausible conclusion is that the "interaction between the [Rule] and the lack of detention capacity necessarily means more aliens will be released and paroled into the [] States." *Texas v. Biden*, 554 F. Supp. 3d 818, 845 (N.D. Tex. 2021) (Kacsmaryk, J.). In fact, both Judge Kacsmaryk and the *New York Times* agree on that score. *See* Miriam Jordan, *One Big Reason Migrants Are Coming in Droves*, New York Times (Jan. 31, 2024), t.ly/JafAb.

That should have been the end of the injury inquiry—especially at the pleading stage. But not so. Resisting that commonsense conclusion, the district court latched onto the post-Rule "*rates*" of "asylum positive credible fear findings and grant[s]." ROA.12927 (emphasis added). As it reasoned, that DHS data showed that the "approval rate" for those findings and grants went down after the Asylum IFR evidenced that the Rule did not actually increase illegal immigration or asylum grants. ROA.12918–12919.

But that is wholly beside the point when everyone *agrees* net illegal immigration increased since implementation of the Asylum Rule. *Compare Texas MPP II*, 20 F.4th at 966 ("[T]he number of 'enforcement encounters'—that is, instances where immigration officials encounter immigrants attempting to cross the southern border without documentation—had 'skyrocketed' since MPP's termination."); *with* ROA.12895 ("In 2022, however, DHS reported more than 2.2 million encounters—a nearly 600% increase. In December 2023 alone, U.S. Customs and Border Protection recorded 249,785 encounters between ports of entry along the southwest border, the highest monthly total on

record, resulting in a total of 302,034 encounters along the southwest border." (citations omitted)).

By way of example, as Americans know all too well, that the *rate* of inflation on the price of a carton of milk might be decreasing does not alter the fact that the carton of milk's price still rose from $3.00 to $4.00. *See* Alicia Wallace, *America's inflation is getting back to normal. But price problems persist*, CNN (Oct. 10, 2024), t.ly/zkvmW. The shopper still comes out of pocket for that extra $1.00. So too here. That the *rate* of credible fear findings and asylum grants has decreased whistles right past the *actual*—and undisputed—increase in illegal migration felt by the States. That fundamental misunderstanding permeated the district court's analysis. ROA.12918–12927.

The district court also mistakenly extrapolated from a marginal decrease in Louisiana's student population that Louisiana had not "actually incurred additional expenses in the area of education as a result of the Asylum IFR." ROA.12922. That is a bridge too far. Injury is assessed relative to the status quo without the policy. *NOAA*, 70 F.4th at 881. Louisiana has seen outmigration of over 100,000 citizens over the last four years. *See* Presley Bo Tyler, *Louisiana population is decreasing.*

*These factors are contributing to the decline*, (Oct. 21, 2024), t.ly/UnMLG. And following the handling of the pandemic, public school attendance has dipped across the country by more than 1 million students. *See* NPR, *American public schools face an existential enrollment crisis* (August 27, 2024), t.ly/Pmjol. So that Louisiana's public school enrollment only marginally declined is the shocking departure from the anticipated real-world status quo.

### 2. The Asylum IFR Increases the States' Costs from Public Benefits to Asylees.

The Asylum Rule also extends the States' public-benefits—like Medicaid, SNAP, FITAP, and TANF—to more putative asylees and for a longer period of time. In fact, federal law requires States pay those entitlements to asylees. *See* 8 U.S.C. § 1182(d)(5). That, too, is an independent Article III injury.

In this Circuit, an agency unlawful action's "removing a categorical bar on receipt of governmental benefits and thereby making a class of persons newly eligible for them provides a focus for judicial review." *Texas MPP II*, 20 F.4th at 987. States thus have standing to challenge an immigration policy that end-runs the statutory bar to public benefits. *See Texas DAPA II*, 809 F.3d at 155; *see also EEOC*, 933 F.3d at 447 (Courts

must "assume, for purposes of the standing analysis, that [the plaintiff] is correct on the merits of its claim[s] that [a rule] was promulgated in violation of the Administrative Procedure Act.").

That is precisely this case. The Asylum Rule unlawfully offers aliens subject to expedited removal proceedings a warp-drive to costly, status-dependent benefits in the States. Put otherwise, Defendants have crafted a regulatory workaround to an otherwise statutory bar to government benefits—and illegally so. That agency action immediately and directly increases the States' mandatory liabilities. *See Texas v. Biden*, 554 F. Supp. 3d at 845.

The proof is in the pudding: The NPRM and Asylum IFR both project net asylum grant increases. According to the NPRM, "the lowest number of credible fear cases received within the last five years was 79,842 in FY 2017, while the highest was 102,204 in FY 2019." 86 Fed. Reg. at 46,933. And the Asylum IFR then implicitly acknowledges the departure from the mean by projecting just three possible scenarios: annual asylum claims of 75,000, 150,000, or 300,000. 87 Fed. Reg. at 18,207. In other words, Defendants themselves believe it plausible that asylum claims could *triple* from pre-Rule annual highs. To illustrate,

even cutting the credible fear asylum grant rates *in half* would not restore pre-Rule annual asylum grant totals.

And trebled asylees cost the States real dollars. Louisiana and Florida proved up the effects of more asylees on the public fisc—just the sort of "big-picture evidence" to support the States' financial injury. *MPP*, 20 F.4th at 971. Florida, for example, spends $2.17 per alien, per month for each SNAP recipient, reflecting its administrative cost share of the SNAP program. ROA.11021–11022. Even more particularized, Louisiana identified 380 asylum claimants that received SNAP benefits from March 2020 to June 2023. ROA. 11022. And as the district court correctly recognized, "administrative costs of the SNAP program are split between the Department of Agriculture and the State of Louisiana." ROA.12920.

More, the States proffered evidence that 5,884 claimants were eligible for the new defensive Asylum Merits Interviews from the jump, of which 757 cases were decided. ROA.11185–11187. As the district court acknowledged, there had already been 404 grants of asylum under the unlawful process. ROA.12919. It also remained undisputed that some of those—at least 56—took place in Miami and New Orleans. ROA.11207–11209. And Florida provided data that traced one of those asylees to

actually receiving Florida-funded medical benefits for 14 claims totaling $532.29. ROA.9496–9497. That is—at absolute minimum—a $500 Article III injury-in-fact.

That only "404 were granted relief"—release into the United States with full public benefits—is not so small as to escape the nominal injury-in-fact threshold. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"). In fact, the existence of unlawful grants of asylum admits the injury. *Cf. DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1963 (2020) ("Most asylum claims … ultimately fail, and some are fraudulent."). The analysis is not complicated: "[T]here were zero aliens coming in through the [Rule] before it existed, so if any come in under the [Rule], that is an increase." *Texas v. DHS*, 722 F. Supp. 3d at 707.

The district court made much ado about parolees not being statutorily eligible for FITAP, SNAP, TANF, or Medicaid. ROA.12921. But that ignores that the asylees—unlawfully granted asylum under the Rule—*are* entitled to those benefits out of the States' wallets. *See* 8 U.S.C. § 1182(d)(5). The benefits to paroled aliens and the benefits to putative asylees are distinct injuries.

More fundamentally, the district court faulted the States for failing to individualize the costs to particular aliens. ROA.12924–12925. But that runs headlong into *Texas MPP II*, 20 F.4th at 971. Large-scale immigration policies, like the Asylum IFR here, are "precisely the sort of large-scale polic[ies] that [are] amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents." *Id.* It follows that the States are under no obligation to "indicate precisely what portion of all costs for illegal aliens is spent on" grantees under the Asylum Rule when "no one doubts that some are." *Texas DACA*, 50 F.4th at 517–18; *see Texas DAPA II*, 809 F.3d at 155 (precise quantification of costs not required). Nor do States have to quantify costs at an individual-by-individual level. *Texas MPP II*, 20 F.4th at 971. Indeed, the district court "offer[ed] no hint as to how [Louisiana or Florida] could make that showing—nor why [they] should." *Id.*

## B. The Supreme Court's Narrow *Priorities* Decision Has No Bearing on The States' Injuries.

Nor did the Supreme Court alter that conclusion in *United States v. Texas*, 599 U.S. 670, 673 (2023) ("*Priorities*"). There, Texas challenged DHS guidelines that prioritized arresting certain criminal aliens, and not

others, over Congress' command that all "shall" be arrested. *Id.* at 674. Texas lacked Article III standing only because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). In other words, the Court's ruling was a straightforward application of its *Linda R.S.* precedent— not some monumental shift in State standing doctrine.

The Court went out of its way to call the case "categorically different" "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* at 684–85. Indeed, citing *Fifth Circuit* precedent, the Court also highlighted that "benefits such as work authorization and Medicare eligibility accompanied by non-enforcement mean that the policy was 'more than simply a non-enforcement policy.'" *Id.* at 683 (citing *Texas DAPA II*, 809 F.3d at 154). So as Justice Gorsuch's concurrence illuminates, the Court has and will continue to permit "States to challenge other Executive Branch policies that indirectly caused them

monetary harms." 599 U.S. at 688 (Gorsuch, J., concurring in the judgment).

## II. THE DISTRICT COURT ERRED IN REQUIRING THE ASYLUM IFR BE THE SOLE CAUSE OF INCREASED ILLEGAL IMMIGRATION.

The States' well-recognized injuries-in-fact are also invariably traceable to the Asylum IFR. In these cases, "causation 'ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'" *FDA*, 602 U.S. at 383. To overcome that burden, a plaintiff need only draw an unattenuated "'line of causation between the illegal conduct and injury'—the 'links in the chain of causation.'" *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)). That chain can have no "speculative links." *Id.* But that poses no hurdle when it is "sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *Id.*; *see Dep't of Com. v. New York*, 588 U.S. 752, 767–68 (2019).

After a year of jurisdictional discovery, no one "was speculating" here. *Texas MPP II*, 20 F.4th at 972. Instead, the Asylum IFR had "already increased the rate of illegal entries and the number of parolees." *Id.* And that was sufficient "to adduce facts showing that [the choices of

the relevant third parties] have been or will be made in such manner as to produce causation." *Id.* (quoting *Lujan*, 504 U.S. at 562). That is because "traceability [i]s satisfied, even when it hinged on foreseeing 'that third parties will likely react in predictable ways … , even if they do so unlawfully." *Id.* at 973 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)). Indeed, "[t]hat is a simple causal inference based on a simple change in incentives"—drawn in the States' favor at this juncture. *Id.*

As the district court found, in the wake of the Asylum IFR, encounters at the southern border ballooned during that time from 400,000 to 2,200,000 annually, some of which ended up in the States. ROA.12895. And the States bear a real financial injury from that illegal migration. *See supra* Section I.A. That again should have been the end of the causation inquiry according to *Texas MPP II* and the like.

Instead, the district court re-traced the rising illegal immigration to terminating the Migrant Protection Program "and *en masse* parole and release of aliens arriving at the southwest border into the country." ROA.12925. In the court's view, the States had to prove that the "cumulative effects" of federal immigration policy were *not* the cause of

the injury in order to show that "the Asylum IFR, *specifically*, has caused an economic injury." ROA.12926.

Respectfully, that is an impossible burden, and it is wrong under this Circuit's precedents. An agency action need not be "the sole cause of the State's injury." *Texas DACA*, 50 F.4th at 519. That the action "exacerbated" the injury "is sufficient." *Id.*; *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (defendants' actions need not be "the very last step in the chain of causation"). And exacerbation is exactly what the States proved here, as the district court implicitly acknowledged.

Special solicitude tips the scales even further. The States are entitled to a special solicitude in the standing analysis when they "challenge[] an agency action as invalid under a statute" and the "challenge involve[s] an agency's alleged failure to protect certain formerly 'sovereign prerogatives [that] are now lodged in the Federal Government.'" *Texas MPP II*, 20 F.4th at 969. So here.

When special solicitude applies, "a state can establish standing without meeting all the normal standards for redressability and immediacy." *Texas DACA*, 50 F.4th at 514. For example, States with threatened quasi-sovereign interests need only show "some possibility"

that "the injury will be redressed by a favorable decision." *Texas DACA*, 50 F.4th at 519–20 (cleaned up). Such special solicitude only further solidifies that the States' injuries fall firmly within the traceability camp.

And, again, *Priorities* is of no moment. *See* 599 U.S. 670. The majority there addressed only whether there was a judicially cognizable *injury in fact*—and said nothing about causation. *See Priorities*, 599 U.S. at 684–686.

## III.   THE STATES' INJURIES ARE REDRESSABLE BY THE COURT.

Redressability also poses no obstacle to the States' standing here. *See FDA*, 602 U.S. at 380 ("The second and third standing requirements—causation and redressability—are often flip sides of the same coin."). Indeed, the district court did not say otherwise.

To establish redressability, a plaintiff must show that its injuries are capable of being remedied "by a favorable decision." *Lujan*, 504 U. S., at 561. Redress is plausible when "a favorable ruling could potentially lessen [the States'] injury." *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014); *see Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[Plaintiffs] need not show that a favorable decision will relieve [their] every injury.").

A typical APA remedy—setting the Asylum IFR aside and enjoining Defendants from implementing it—does just that. With the Asylum Rule set aside, executive officials "would abide by an authoritative interpretation" of IIRIRA, *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992), and "third parties w[ould] likely react in predictable ways," *Dep't of Com.*, 588 U.S. at 767–68; *see, e.g.*, *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 396–98 (5th Cir. 2015); *State v. Rettig*, 987 F.3d 518, 528–29 (5th Cir. 2021). And that redress is especially likely given the violation of the States' procedural rights. *Massachusetts v. EPA*, 549 U.S. 497, 517–18 (2007) ("When a litigant is vested with a procedural right, the litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."); *see Texas DACA*, 50 F. 4th at 517.

\*    \*    \*

Bottom line: If Texas had Article III standing to challenge DACA, DAPA, the termination of MPP, and the border wall expenditures, these eighteen States certainly have suffered an Article III injury plausibly traceable to the unlawful Asylum IFR and redressable by a federal court sufficient to challenge the Asylum IFR here.

# CONCLUSION

The Court should reverse and remand.

Date: November 27, 2024

Respectfully Submitted,
By: */s/ Zachary Faircloth*

STEVE MARSHALL
   Attorney General of Alabama
EDMUND G. LACOUR JR.
   Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel: (334) 242-7300
Edmund.Lacour@alabamaag.gov

*Counsel for Plaintiff-Appellant*
*State of Alabama*

TIM GRIFFIN
   Arkansas Attorney General
NICHOLAS J. BRONNI
   Solicitor General
DYLAN L. JACOBS*
   Deputy Solicitor General
Office of the Arkansas Attorney
General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel: (501) 682-2007
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for Plaintiff-Appellant*
*State of Arkansas*

ELIZABETH B. MURRILL
   Louisiana Attorney General
J. BENJAMIN AGUIÑAGA
   Solicitor General
ZACHARY FAIRCLOTH
   Principal Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70802
Tel: (225) 326-6705
Fax: (225) 326-6297
AguinagaJ@ag.louisiana.gov
FairclothZ@ag.louisiana.gov

*Counsel for Plaintiff-Appellant*
*State of Louisiana*

ANDREW BAILEY
   Attorney General of Missouri
MARIA LANAHAN
   Deputy Solicitor General
Attorney General Office of Missouri
815 Olive St., Ste. 200
St. Louis, Missouri 63101
Tel: (314) 340-4978
Maria.Lanahan@ago.mo.gov

*Counsel for Plaintiff-Appellant*
*State of Missouri*

CHRISTOPHER M. CARR
   Attorney General Of Georgia
STEPHEN J. PETRANY
   Solicitor General
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334
Tel: (404) 458-3408
Spetrany@law.ga.gov

*Counsel for Plaintiff-Appellant*
*State of Georgia*

THEODORE E. ROKITA
   Indiana Attorney General
BETSY M. DENARDI
   Special Counsel Of Complex
Litigation
Office of the Indiana Attorney
General
302 W. Washington St.
Indiana Government Center South
- 5th Floor
Indianapolis, Indiana 46204
Tel: (317) 232-6231
Betsy.Denardi@atg.in.gov

*Counsel for Plaintiff-Appellant*
*State of Indiana*

RUSSELL COLEMAN
   Attorney General Of Kentucky
MATTHEW F. KUHN
   Solicitor General
Kentucky Office of the
Attorney General
700 Capital Avenue, Suite 118

ASHLEY MOODY
   Attorney General of Florida
HENRY C. WHITAKER
   Solicitor General of Florida
Office of the Florida Attorney
General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Tel: (850) 414-3300
James.Percival@myfloridalegal.com

*Counsel for Plaintiff-Appellant*
*State of Florida*

RAÚL LABRADOR
   Attorney General of Idaho
ALAN HURST
   Solicitor General
MICHAEL ZARIAN
   Deputy Solicitor General
Office of the Idaho Attorney
General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, Idaho 83720
Tel: (208) 334-2400
Michael.Zarian@ag.idaho.gov

*Counsel for Plaintiff-Appellant*
*State of Idaho*

KRIS KOBACH
   Attorney General
ANTHONY J. POWELL
   Solicitor General
Office of the Kansas Attorney
General
120 SW Tenth Ave., 3rd Floor

Frankfort, Kentucky 40601
Tel: (502) 696-5300
Matt.Kuhn@ky.gov

*Counsel for Plaintiff-Appellant*
*Commonwealth of Kentucky*

LYNN FITCH
   Attorney General Of Mississippi
JUSTIN L. MATHENY
   Deputy Solicitor General
Mississippi Attorney General's
Office
P.O. Box 220
Jackson, Mississippi 39205-0220
Tel: (601) 359-3680
Justin.Matheny@ago.ms.gov

*Counsel for Plaintiff-Appellant*
*State of Mississippi*

GENTNER DRUMMOND
   Oklahoma Attorney General
GARRY M. GASKINS, II
   Solicitor General
ZACH WEST
   Director of Special Litigation
Office of Attorney General
State of Oklahoma
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
Tel: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

*Counsel for Plaintiff-Appellant*
*State of Oklahoma*

Topeka, Kansas 66612-1597
Tel: (785) 368-8539
Dwight.Carswell@ag.ks.gov

*Counsel for Plaintiff-Appellant*
*State of Kansas*

AUSTIN KNUDSEN
   Attorney General
CHRISTIAN B. CORRIGAN
   Solicitor General
PETER M. TORSTENSEN, JR.
   Deputy Solicitor General
Montana Department Of Justice
215 N Sanders Street
Helena, Montana 59601
Tel: (406) 444-2707
Christian.Corrigan@mt.gov
Peter.Torstensen@mt.gov

*Counsel for Plaintiff-Appellant*
*State of Montana*

MICHAEL T. HILGERS
   Attorney General
ERIC J. HAMILTON
   Solicitor General
ZACHARY A. VIGLIANCO*
   Deputy Solicitor General
Office of the Nebraska Attorney
General
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2683
Zachary.Viglianco@nebraska.gov

*Counsel for Plaintiff-Appellant*
*State of Nebraska*

ALAN WILSON
  South Carolina Attorney General
THOMAS T. HYDRICK
  Assistant Deputy Solicitor General
South Carolina Office of the Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
Tel: (803) 734-4127
Thomashydrick@scag.Gov

*Counsel for Plaintiff-Appellant State of South Carolina*

SEAN D. REYES
  Utah Attorney General
STANFORD PURSER
  Utah Solicitor General
Utah Office of the Attorney General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, Utah 84114-2320
Tel: (801) 538-9600
SPurser@agutah.gov

*Counsel for Plaintiff-Appellant State of Utah*

BRIDGET HILL
  Attorney General Of Wyoming
RYAN SCHELHAAS
  Chief Deputy Attorney General
Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
Ryan.Schelhaas@wyo.gov

*Counsel for Plaintiff-Appellant State of Wyoming*

PATRICK MORRISEY
  Attorney General
MICHAEL R. WILLIAMS
  Solicitor General
Office of the West Virginia Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Tel: (681) 313-4550
Michael.R.Williams@wvago.gov

*Counsel for Plaintiff-Appellant State of West Virginia*

## CERTIFICATE OF SERVICE

I certify that on November 27, 2024, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ Zachary Faircloth*
ZACHARY FAIRCLOTH

# CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this motion complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 35(b)(2) because it contains 7,313 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

/s/ Zachary Faircloth
ZACHARY FAIRCLOTH

Dated:    November 27, 2024