# No. 24-30359

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

State of Louisiana; State of Missouri; State of Arkansas; State of Florida; State of Georgia; State of Idaho; State of Kansas; Commonwealth of Kentucky; State of Mississippi; State of Montana; State of Nebraska; State of Oklahoma; State of South Carolina; State of Utah; State of West Virginia; State of Alabama; State of Indiana; State of Wyoming,

*Plaintiffs-Appellants*,

v.

Todd Wallace Blanche, U.S. Attorney General; United States Department of Justice; Sirce E. Owen, in her official capacity as Acting Director of the Executive Office for Immigration Review; Executive Office of Immigration Review; Markwayne Mullin, Secretary, U.S. Department of Homeland Security; United States Department of Homeland Security; Rodney Scott, Commissioner, U.S. Customs and Border Protection; United States Customs and Border Protection;, David Venturella, Senior Official Performing the Duties of Director of United States Immigration and Customs Enforcement; United States Immigration and Customs Enforcement; Joseph Edlow, Acting Director of U.S. Citizenship and Immigration Services; United States Citizenship and Immigration Services; Rosario Vasquez, in his official capacity as Chief of United States Border Patrol; United States Border Patrol; United States of America,[1]

*Defendants-Appellees*,

[1] The deputy clerk provided the parties with an updated caption. Dkt. 153. However, pursuant to Federal Rule of Appellate Procedure 43(c), the following substitutions have been made: Sirce E. Owen has been substituted for Mary Cheng; Rodney Scott has been substituted for Troy Miller; David Venturella has been substituted for Patrick J. Lechleitner; Joseph Edlow has been substituted for Angelica Alfonso-Royals; Rosario Vasquez has been substituted for Raul Ortiz.

On Appeal from the United States District Court
for the Western District of Louisiana, Case No. 6:22-cv-01130

**BRIEF FOR DEFENDANTS-APPELLEES**

JONATHAN D. GUYNN
*Acting Assistant Attorney General*
Civil Division

AUGUST FLENTJE
*Deputy Director*

ELISSA P. FUDIM
*Trial Attorney*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation,
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

## CERTIFICATE OF INTERESTED PERSONS

Under the fourth sentence of Fifth Circuit Rule 28.1.1, Appellees, as governmental parties, are not required to provide a certificate of interested persons.

*/s/ Elissa Fudim*
ELISSA P. FUDIM
United States Department of Justice

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully request oral argument in this case.

## TABLE OF CONTENTS

INTRODUCTION ..........1

STATEMENT OF JURISDICITON ..........4

ISSUE PRESENTED..........5

STATEMENT OF THE CASE..........5

I. Legal Background ..........5

II. Procedural History..........8

SUMMARY OF THE ARGUMENT ..........11

STANDARD OF REVIEW ..........14

ARGUMENT ..........14

I. APPELLANTS LACK STANDING..........14

A. Florida and Louisiana failed to establish that they sustained an injury as a result of the IFR..........14

(i) The States did not show that that the IFR caused an increase in illegal immigration, the number of aliens granted asylum, or the number of aliens paroled in Florida or Louisiana ..........15

(ii) The Appellants did not establish that they suffered increased costs as a result of the IFR..........22

B. The States Cannot Show Traceability ........................................35

C. The States Cannot Show Redressability ........................................37

D. The States Are Not Entitled To Special Solicitude ........................................40

E. The States' Claimed Injury is Not Judicially Cognizable ........................................42

(i) This Case and *Priorities* Concern Policies Vested with Discretion ........................................44

(ii) There is no History or Tradition of Cases Challenging Parole Policies or Based on Similarly Indirect Injuries ........................................46

(iii) The States' Attempt To Escape the Holding of *Priorities* Fails ........................................51

CONCLUSION ........................................53

# TABLE OF AUTHORITIES

Cases

*Arizona v. Biden*,
31 F.4th 469 (6th Cir. 2022) .......... 37, 50

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) .......... 20, 20, 37, 47

*Arpaio v. Obama,*
27 F. Supp. 3d 185 (D.D.C. 2014), .......... 22, 30, 47

*Boelens v. Redman Homes, Inc.,*
759 F.2d 504 (5th Cir. 1985) .......... 13

*California v. Texas,*
141 S. Ct. 2104 (2021) .......... 41

*Clapper v. Amnesty International USA,*
568 U.S.398 (2013) .......... 22, 32, 50

*Crane v. Johnson*,
783 F.3d 244 (5th Cir. 2015) .......... 36, 50

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .......... 15

*Davis v. F.E.C.*,
554 F.3d 724 (8th Cir. 2008) .......... 53

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) .......... 34

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 11, 20, 41

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... passim

*Florida v. Mellon*,
273 U.S. 12 (1927). .......... 41, 49, 51

*Florida v. United States*,
660 F. Supp. 3d 1239 (N.D. Fla. 2023) .......................................... 12, 35

*Garland v. Aleman Gonzalez*,
142 S. Ct. 2057 (2022) .......................................................................40

*Gen. Land Off. v. Biden*,
71 F.4th 264 (5th Cir. 2023)........................................... 11, 20, 24, 49

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ............................................................................46

*Heckler v. Chaney*,
470 U.S. 821 (1985) ............................................................................51

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) ............................................................................49

*Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*,
946 F.3d 649 (5th Cir. 2019)..............................................................38

*In re Gee*,
941 F.3d 153 (5th Cir. 2019) ..............................................................31

*Loa-Herrera v. Trominski*,
231 F.3d 984 (5th Cir. 2000)..............................................................47

*Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*,
70 F.4th 872 (5th Cir. 2023)................................................................32

*Lujan v. Defs. Of Wildlife*,
504 U.S. 555 (1992) ....................................................................... passim

*Lynch v. Leis*,
382 F.3d 642 (6th Cir. 2004)..............................................................53

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ............................................................................41

*Morton v. Ruiz*,
415 U.S. 199 (1974) ............................................................................45

*Paterson v. Weinberger*,
644 F.2d 521 (5th Cir. 1981) .......... 16

*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976) .......... 50

*Raines v. Byrd*,
521 U.S. 811 (1997) .......... 46

*Ramming v. United States*,
281 F.3d 158 (5th Cir. 2001) .......... 14

*Rockwell Int'l Corp. v. United States*,
549 U.S. 457 (2007) .......... 13

*S. Utah Wilderness All. v. Palma*,
707 F.3d 1143 (10th Cir. 2013) .......... 53

*Smith v. GC Servs. Ltd. P'ship*,
986 F.3d 708 (7th Cir. 2021) .......... 31

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) .......... 38, 53

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 32, 39, 40

*Tenth St. Residential Ass'n v. City of Dallas, Texas*,
968 F.3d 492 (5th Cir. 2020) .......... 20

*Texas v. Biden*,
20 F.4th 928 (5th Cir. 2021) .......... 12, 21, 23, 36

*Texas v. Biden*,
589 F. Supp. 3d 595 (N.D. Tex. 2022) .......... 20

*Texas v. United States*,
50 F.4th 498 (5th Cir. 2022) .......... passim

*Texas v. United States*,
106 F.3d 661 (5th Cir. 1997) .......... 47, 51

*Texas v. United States*,
787 F.3d 733 (5th Cir. 2015) ........................................................................12

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) ........................................................................21

*Trump v. New York*,
141 S. Ct. 530 (2020) ...................................................................................41

*United States v. Texas,*
*(*599 U.S. 670 (2023) ............................................................................ passim

*Warth v. Seldin*,
422 U.S. 490 (1975) .............................................................................. 48, 50

*Weiser v. Castille*,
No. 22-30720, 2023 WL 4582417 (5th Cir. July 18, 2023) ................................14

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
5 F.4th 997 (9th Cir. 2021) ...........................................................................37

Statutes

5 U.S.C. §§ 701-06 ..............................................................................................4

8 U.S.C. § 1103(a) ............................................................................................51

8 U.S.C. § 1158 ...................................................................................................5

8 U.S.C. § 1182(d)(5) ............................................................................ 29, 45, 52

8 U.S.C. § 1225 .................................................................................................40

8 U.S.C. § 1225(b)(1) ........................................................................ 5, 6, 7, 40, 52

8 U.S.C. § 1225(b)(1)(A)(i) ...................................................................................5

8 U.S.C. § 1225(b)(1)(A)(ii) ..................................................................................5

8 U.S.C. § 1225(b)(1)(B)(i)-(ii) ...............................................................................7

8 U.S.C. § 1225(b)(1)(B)(ii) ............................................................................ 6, 45

8 U.S.C. § 1225(b)(1), and (ii) .......... 6, 45

8 U.S.C. § 1225(b)(3) .......... 52

8 U.S.C. § 1226(a)(2)(B) .......... 47

8 U.S.C. § 1229a .......... 1, 6

8 U.S.C. § 1252(f)(1) .......... 39, 40

8 U.S.C. § 1226(c) .......... 45

8 U.S.C. § 1231(a)(2) .......... 45

28 U.S.C. § 1291 .......... 4

28 U.S.C. § 1331 .......... 4

28 U.S.C. § 1346 .......... 4

28 U.S.C. § 1361 .......... 4

## INTRODUCTION

In 2021 and 2022, the Department of Homeland Security ("DHS") faced a historically high level of migration that threatened to exacerbate the backlog of cases in immigration court. As part of efforts to address this challenge, the Departments of Justice and Homeland Security (jointly, the "Departments") implemented an interim final rule, entitled *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18078 (Mar. 29, 2022) ("IFR")— which was operational for a short period of time, in a limited geographic area, and is no longer operational, and which Defendants are actively working to repeal. This IFR made changes to facilitate broader application of the expedited removal provisions to remove aliens with non-meritorious asylum claims more quickly. *Id.* at 18088.

By removing various operational constraints, the IFR avoided the need to process these aliens "through the lengthy and backlogged ordinary section 240 [8 U.S.C. § 1229a] removal proceedings" in the immigration courts, allowing "DHS to more efficiently obtain orders of removal." *Id.* at 18108-09. And for aliens with meritorious claims, the IFR created a process intended to more quickly resolve those cases by having "asylum claim[s] adjudicated following an Asylum Merits interview before a U.S. Citizenship and Immigration Services asylum officer in the first instance, rather than by an [immigration judge] in section 240 removal proceedings"

in immigration court. *Id.* at 18085, 18088. The Executive Office for Immigration Review ("EOIR") has a heavy case backlog, *id.* at 18111, meaning that aliens whose claims will eventually be denied are often able to remain in the country for years before their case is resolved and they are ordered removed. The IFR was intended to reduce the overall workload and backlog of cases in the immigration courts and allow those courts to focus "on other priority work." *Id.* at 18089. By ensuring that "individuals who are ineligible [for asylum or other protection] may more promptly be ordered removed," *id.* at 18088, and "by reducing the amount of time an [alien] can expect to remain in the United States" while their asylum claims are pending, the rule was intended to reduce "a critical incentive for [aliens] not in need of protection to exploit the system." *Id.* at 18192.

Notwithstanding these goals, nineteen states led by Louisiana and Florida challenged the IFR, claiming counterfactually that it would increase unlawful migration to the United States generally and to their States specifically, and that it would cause an increase in non-meritorious asylum grants. The evidence did not bear this out.

Following jurisdictional discovery and fulsome motion practice on Appellees' factual attack on Appellants' standing, the district court found that Appellants, who expressly limited their assertions of harm for standing purposes to Florida and Louisiana, had not put forward evidence to support standing. The court found that

total encounters of aliens at the border were *lower* in the months after the IFR took effect, as was the asylum grant rate by asylum officers pursuant to the IFR compared to grant rates in immigration court. The court also found that the States presented no evidence that they incurred costs from providing services to the limited cohort of aliens processed for asylum under the IFR.

On appeal, the States do not challenge the district court's conclusions that the IFR led to a decrease in the asylum approval rate. They do not even attempt to show that the IFR led to an increase in the approval of non-meritorious claims. And they do not point to any evidence to show that their costs for providing social services, such as law enforcement costs, education costs, driver's license costs, or Medicaid costs increased following the implementation of the IFR, much less because of it. Instead, their argument in support of their claim to standing is that the district court supposedly found that following the implementation of the IFR, the number of Border Patrol encounters with aliens between ports of entry at the Southwest "ballooned." App. Br. at 25. And because there was an increase, the States posit that it is logical to presume that the States' costs have or will increase. *Id*. at 21-29.

Those arguments fail. The district court did not find that the number of encounters at the Southwest border ballooned following the implementation of the IFR—much less because of it. The district court found unlawful immigration "ballooned" between 2011 and 2022. ROA.12895. The court also correctly

concluded that the States failed to provide any evidence that the IFR was responsible for this increase. Rather, the evidence showed that the IFR resulted in a decrease in the asylum grant rate. ROA.12918.

Additionally, none of the States' aleged injuries are cognizable injuries for establishing Article III standing. *See United States v. Texas ("Priorities")*, 599 U.S. 670 (2023). The States alleged only speculative, indirect costs they might incur if the IFR increased the number of aliens residing in Louisiana and Florida. Following the *Priorities* decision, which rejected a similar standing argument by Texas, such allegations of indirect costs are no longer sufficient grounds to invoke Article III jurisdiction. *Id.* at 1972 n.3.

Appellants cannot show that the district court clearly erred in finding that the States failed to proffer any evidence that they had been harmed, or faced imminent harm, from IFR. This Court should affirm the district court's dismissal.

## STATEMENT OF JURISDICTION

The States alleged jurisdiction under 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 701-06. ROA.2194 at ¶ 60. The district court entered judgment on April 17, 2024. ROA.55. The States noticed this appeal on June 7, 2024. ROA.56. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

## ISSUE PRESENTED

1. Whether Appellants have standing to challenge the IFR.

## STATEMENT OF THE CASE

### I. Legal Background

Congress authorized DHS to summarily remove from the United States certain aliens arriving in the United States or "certain other aliens" who cannot show the requisite continuous presence as designated by the Secretary. *See* 8 U.S.C. § 1225(b)(1); 8 C.F.R. § 235.3(b). Under this summary-removal mechanism—known as expedited removal—an alien "arriving in the United States" or within the classes of aliens designated by the Secretary who an immigration officer determines lacks valid entry documentation or makes a material misrepresentation, shall be "order[ed] ... removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see id.* § 1182(a)(6)(C), (a)(7).

Additional procedures apply if an alien asserts an "intention to apply for asylum ... or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(ii); *see also id.* §§ 1158(a)(1), 1225(b)(1)(A)(ii). In that situation, an alien is provided a non-adversarial interview with an asylum officer at which the officer determines whether the alien has a "credible fear of persecution" or torture, and may request *de novo* review of a negative determination by an immigration judge (IJ), to consult with a

person of the alien's choosing during the credible fear process, and to have an interpreter. 8 U.S.C. §§ 1225(b)(1)(A)(ii), (b)(1)(B)(iii)(II), (b)(1)(B)(iv), (v); *see* 8 C.F.R. §§ 208.30(d), (d)(4), (d)(5); 1003.42(d), 1208.30(g)(2). If the asylum officer or IJ, upon review of an officer's negative credible fear finding, determines the alien has a credible fear of persecution or torture, then the individual is "detained for further consideration of the application for asylum," 8 U.S.C. § 1225(b)(1)(B)(ii), unless that individual is released on parole. Although § 1225(b)(1)(B)(ii) does not specify how that "further consideration" should occur, the prior regulations provided that the alien is placed in removal proceedings before an IJ under 8 U.S.C. § 1229a. *See* 8 C.F.R. § 208.30(f). Alternatively, if both the officer and the IJ find that the alien lacks a credible fear of persecution, the alien shall be "removed from the United States without further hearing or review." 8 U.S.C. §§ 1225(b)(1)(B)(iii)(I), (b)(1)(C); 1252(a)(2)(A)(iii), (e)(2); 8 C.F.R. §§ 1003.42(f), 1208.30(g)(2)(iv)(A).

On August 20, 2021, the Departments jointly published a notice of proposed rulemaking ("NPRM"). The NPRM proposed amending the regulations governing the procedures implementing "further consideration of the application for asylum," 8 U.S.C. § 1225(b)(1)(B)(ii), for individuals subject to expedited removal who are found to have a credible fear of persecution or torture under 8 U.S.C. § 1225(b)(1), and the procedures addressing release on parole during the pendency of consideration of that application. 86 Fed. Reg. 46906 (proposed Aug. 20, 2021); *see*

*also* 87 Fed. Reg. at 18079 (explaining that the NPRM proposed "to amend the regulations governing the process for further consideration of asylum and related protection claims raised by individuals subject to expedited removal and found to have a credible fear of persecution or torture" under 8 U.S.C. § 1225(b)(1)(B)(i)-(ii)).

On March 29, 2022, after receiving and reviewing public comments submitted in response to the NPRM, the Departments issued the IFR. 87 Fed. Reg. 18078. As the NPRM indicated, the Departments issued the IFR to implement § 1225(b)(1), which the IFR notes "provides that if an asylum officer determines that a [alien] subject to expedited removal has a credible fear of persecution, the [alien] shall receive 'further consideration of the application for asylum.'" 87 Fed. Reg. at 18080. The "IFR addresses how that further consideration, including of the [alien]'s related claims to statutory withholding of removal and [Convention Against Torture] protection, will occur," *id.* at 18080—namely by allowing an asylum officer to make a decision on the merits rather than simply refer the application to the already-backlogged immigration courts. *Id.*

The IFR's processes for asylum merits interviews in the IFR were applied to a limited group "whose intended destination is one of nine destination cities," which are "Arlington[, Virginia], Boston, Chicago, Los Angeles, Miami, New Orleans, New York, Newark, and San Francisco." ROA.8512.

The IFR did "not change the substantive standard for asylum eligibility." 87 Fed. Reg. at 18192. For those aliens processed under the IFR, from June 2022 through August 2023—the period from when the IFR was put in place through briefing on the motion to dismiss—credible fear was found in 52% of cases, compared to 68% of cases in 2021, before the IFR. ROA.8513. Likewise, asylum officers granted asylum in only 22.1% of cases processed under the IFR, compared to asylum officer grant rates of 26-37% in Fiscal Years 2017 through 2021. ROA. 8513; 87 Fed. Reg. at 18116 n.57. For comparison, in FY 2023, in asylum cases originating from credible fear claims that are not processed under the IFR, IJs granted asylum 55% of the time (7,809 out of 14,173) in cases with merits dispositions (*i.e.*, setting aside cases that were abandoned, closed, or withdrawn). ROA.8476.

As Appellees have reported, the IFR has not been operational since June 6, 2024, and Appellees are in the process of rescinding the IFR through the rulemaking process. *See* Dkt. 123, Exh. 1; Dkt. 147.

## II. Procedural History

On April 28, 2022, one month after the IFR was announced, Appellants filed a complaint challenging it. ROA.24. They twice amended their complaint. ROA.26; 36. In the operative Second Amended Complaint, filed on November 10, 2022, Appellants alleged that the IFR's adjudication and parole provisions violate the APA

as arbitrary and capricious; exceed statutory authority; lacked notice and comment; and violate the Secure Fence Act and the Take Care Clause of the U.S. Constitution. ROA.2179-2249. Appellants alleged that the IFR would increase grants of non-meritorious asylum claims, which would, in turn, require the States to provide status-dependent benefits in the areas of education, healthcare, public assistance, and general government services it otherwise would not have. *Id*. Appellants alleged they would therefore be injured by increased costs for Medicaid, Supplemental Nutrition Assistance Program ("SNAP"), and Temporary Assistance for Needy Families ("TANF"). *Id*.

Following jurisdictional discovery, on December 22, 2024, Appellees moved to dismiss, raising a factual attack on standing under Federal Rule 12(b)(1) and seeking dismissal for failure to state a claim under Rule 12(b)(6). ROA.8457-8511. The district court granted the motion and dismissed the case for lack of standing on April 16, 2024. ROA.56, ROA.12892-12930.

The district court acknowledged that "states have in some instances been able to show injury in fact by demonstrating the additional costs paid by state-funded agencies because of additional aliens," but noted that "importantly, 'harm' in the immigration context is understood and evaluated as relative to the status quo, and relative to Plaintiff's position absent the challenged policy." ROA.12917 (internal citations omitted). Thus, the district court's standing analysis was guided by the

proposition that "when deciding whether a state has been injured for Article III standing purposes, courts review whether the number of aliens, and the associated costs attributable to them, increased relative to those same numbers prior to the implementation of the challenged program." ROA.12917-12918. The court found that Appellants failed to establish standing because the facts presented showed that "[a]sylum positive credible fear findings and grant rates in the United States have gone down since the implementation of the Asylum IFR," and "[t]he same is true for the asylum grant rate by asylum officers under the Asylum IFR." ROA.12918.

The court concluded its standing inquiry by stating:

> [I]t is not the province of the Court to determine the cumulative effect this administration's policy choices have had on Plaintiff States. Rather, the Court must determine only whether there is evidence in the record substantiating the Plaintiff States' claims that the *Asylum IFR* specifically contributed to these increased costs. Plaintiff States fail to make this showing. Rather, the record shows: (i) Asylum grant rates in the United States have gone down since the implementation of the Asylum IFR; (ii) where the Asylum IFR's asylum-adjudication procedures have been applied, the Rule has not resulted in a higher rate of positive credible fear findings or asylum grants by asylum officers; and (iii) Louisiana and Florida are unable to otherwise demonstrate increased costs attributable to the implementation of the Asylum IFR relative to their costs before the Asylum IFR was implemented.

ROA.12926-12927.

## SUMMARY OF THE ARGUMENT

The district court correctly found Florida and Louisiana, the only States that attempted to establish standing, did not present evidence of harm to overcome Appellees' factual challenge to their standing.

First, Appellants did not establish any injury. They could not demonstrate that the IFR caused any increase in illegal immigration or the asylum grant rate. Rather, the evidence shows that Border Patrol encounters with aliens at the Southwest border fell in the three months after the IFR was implemented and that the asylum grant rate *decreased* after the IFR took effect. ROA.8769.

Unable to counter this evidence, Appellants argue that the district court improperly considered the asylum grant rate rather than simply the number of aliens granted asylum following the IFR's implementation. App. Br. at 28-29. But in their Complaint, Appellants claimed injury based on their theory that the IFR would cause an increase in the asylum grant rate. ROA.2183. The district court reasonably considered whether Appellants could establish their own theory of injury. Furthermore, the district court's consideration of the asylum grant rate was in line with numerous other cases where this Court and the Supreme Court have considered similar rate changes. *See*, *e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 753 (2019); *Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023).

Appellants also did not demonstrate that either Florida or Louisiana sustained increased social service costs—let alone because of the IFR. Appellants cite decisions in other cases, challenging other policies, where this Court found that standing may be based on increased costs where the evidence establishes that the challenged programs caused an increase in the States' alien population. App. Br. at 21-34 (citing *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021), *rev'd and remanded on other grounds*, 597 U.S. 785 (2022), *Texas v. United States*, 50 F.4th 498 (5th Cir. 2022), *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015)). But here, neither Florida nor Louisiana showed that the IFR led to any increase in their States' populations.

Second, Appellants cannot show traceability. Appellants do not even attempt to show that any costs they claim to have suffered are traceable to the IFR. Indeed, these same States have alleged in other litigation that these same costs are a result of *other* programs. *See*, *e.g.*, *Florida v. United State*s, 660 F. Supp. 3d 1239 (N.D. Fla. 2023) (where Florida claimed it sustained educational, law enforcement, Medicaid and other social service costs from aliens as a result of the Parole Plus Alternatives to Detention policy). Contrary to Appellants' arguments, the district court did not require them to "prove other policies *did not* cause the massive influx of illegal immigrants." App. Br. at 2. Rather, the district court correctly found Appellants failed to show that the IFR even "contributed" to any influx or increase. ROA.12296.

Third, Appellants cannot show redressability. Even without the IFR, immigration judges retain the authority and discretion to grant asylum to aliens, and the evidence shows asylum officers operating under the IFR do not grant asylum at a higher rate.

Fourth, Appellants are not entitled to special solicitude. The Supreme Court's decision in *Priorities* confirmed that special solicitude has no application when a State asserts the type of indirect injuries Appellants allege here.

Fifth, Appellants' alleged injuries are not cognizable for purposes of establishing Article III standing. *See United States v. Texas* ("*Priorities*"), 599 U.S. 670 (2023). Following *Priorities*, it is no longer sufficient for a State simply to argue that some change in federal policy may cause a change in population that may cause indirect changes in States expenditures with respect to social services. 599 U.S. at 680, n.3. When faced with an identical theory of harm in *Priorities*, the Supreme Court found the plaintiffs lacked standing. *Id.*; *see also, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383-84 (2024). And the Laken Riley Act does not change that because standing is assessed at the time a complaint, or here, the amended complaint, is filed. *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007) ("[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction.") (citing *Boelens v. Redman Homes, Inc.,* 759 F.2d 504, 508

(5th Cir. 1985)). Additionally, the Laken Riley Act concerns statutory standing; it does not dispense with the Article III standing.

For all these reasons, the district court correctly determined that Appellants lack standing, and this Court should affirm.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal for lack of jurisdiction. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). But "in a 12(b)(1) factual attack, the district court's resolution of disputed jurisdictional facts is reviewed for clear error." *Weiser v. Castille*, No. 22-30720, 2023 WL 4582417, at *2 (5th Cir. July 18, 2023) (quoting *Ramming*, 281 F.3d at 161).

## ARGUMENT

### I. Appellants Lack Standing

#### A. Florida and Louisiana failed to establish that they sustained an injury as a result of the IFR

Florida and Louisiana failed to offer evidence sufficient to establish the elements of standing by a preponderance of the evidence, and as a result the district court's decision dismissing this case was proper. To establish standing, a plaintiff must show that it has suffered or will imminently suffer an "injury in fact" "caused" by the challenged government action that a favorable decision would "redress." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–62 (1992). The States bear the burden to "demonstrate standing separately for each form of relief sought."

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). The States alleged that the IFR would increase migration to the United States and increase the number of aliens granted asylum or parole while seeking asylum. They argued these increases would result in additional costs borne by Florida and Louisiana. But the district court was correct that they offered no evidence of this.

**(i) The States did not show that that the IFR caused an increase in illegal immigration, the number of aliens granted asylum, or the number of aliens paroled in Florida or Louisiana**

In the months following the implementation of the IFR, border encounters at the Southwest border decreased. ROA.87698. Yet Appellants claim that "the district court, by all accounts, agreed that the evidence showed a predictable spike in illegal immigration following the Asylum IFR's implementation in May 2022." App. Br. at 25. In fact, Appellants claim the district court found that "encounters at the southern border ballooned during *that time* from 400,000 to 2,200,000 annually." *Id.* (emphasis added). But that is not true. When the district court referenced the increase in border encounters from 400,000 to 2,200,000, it did not refer to an increase after the IFR was implemented. Rather, the Court was comparing the number of border encounters on average between 2011 and 2017 to 2022. ROA.112895. The States presented no evidence to the district court on the number of border encounters following implementation of the IFR or evidence that the IFR caused any increase.

In contrast, Appellees submitted expert evidence showing that the IFR did not cause an increase in immigration. Michael A. Clemens—a professor of economics who specializes in the cause and effects of international migration—analyzed the States' allegations of harm in this case. ROA.8765-8798. Appellants alleged that the IFR "makes it easier for [aliens] with non-meritorious asylum claims to be released into the United States," which will thus "induce an increase of immigration to the United States" and lead to the release of thousands of aliens into their States. ROA.2197 at ¶ 67. However, Prof. Clemens found there was no evidence that the IFR, by itself, was sufficient to have an impact on overall U.S. Customs and Border Protection ("CBP") encounters at the Southwest Border. ROA.8769. Prof. Clemens concluded the available data shows that encounters were *lower* in the months after the IFR took effect than before it, and the post-IFR trends in encounters of aliens affected by the IFR were "indistinguishable" from trends in encounters of similar aliens who were not affected by the IFR. *Id.* Thus, not only did the States fail to put forward evidence to support their claim that the IFR specifically increased immigration, but Appellants put forward unrefuted expert evidence showing the exact opposite, shifting the burden to the States to rebut it. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

It is unsurprising that the IFR did not increase the asylum grant rates. The IFR did not change the standard for granting asylum but simply focused on the process

by which asylum claims would be adjudicated to allow for increased use of expedited removal and reduce the time it takes to resolve claims. 87 Fed. Reg. at 18115. As the IFR explains, it was designed to *decrease* incentives for unlawful migration by individuals lacking valid asylum claims and expedite the lawful removal of such individuals who do come to the United States. 87 Fed. Reg. at 18192.

Appellants failed to show that the IFR resulted in a higher rate of positive credible fear findings or asylum grants by asylum officers.[2] On the contrary, the data shows that, between the time when the IFR went into effect in June 2022 and August 2023, there were 5,884 credible fear outcomes for those processed through the IFR heading to one of the nine destination cities for which the IFR has thus far been implemented. ROA.8513. Of those, in 3,037 cases there was a positive credible fear finding—meaning the individual could further pursue asylum through the asylum-officer conducted asylum-merits interview ("AMI") process created by the IFR. *Id.* There was a negative credible fear finding—meaning the individual would be ordered removed unless that determination was reversed by an IJ—in 2,435 cases. *Id.* This equates to asylum officers finding credible fear in 52% of cases under the IFR. *See id.* By comparison, before the IFR was applied, in 2021, the agency

[2] Appellants claim that the NPRM and IFR "project[ed] net asylum grant increases." App. Br. at 31. Not so. USCIS estimated the staffing resources it would need to implement the IFR by assessing three potential volumes of credible fear cases, at 75,000, 150,000, and 300,000. 87 Fed. Reg. at 18207. These were not predictions for asylum grant rates.

completed 43,958 credible fear cases, found credible fear in 29,869 of those and did not find credible fear in 11,711, for an overall credible fear finding rate of 68%. ROA.8475. Thus, the district court correctly concluded that "[a]sylum positive credible fear findings ... in the United States have gone down since the implementation of the Asylum IFR." ROA.12918.

The same is true for the asylum grant rate by asylum officers under the IFR. For Fiscal Years 2017 through 2021, prior to the IFR, overall approval rates for asylum claims adjudicated by both asylum officers[3] and immigration judges ("IJ") were in the 26–37% range. 87 Fed. Reg. at 18116 n.57. By comparison, of the 1,824 total AMI cases handled by asylum officers under the IFR through April 2023, asylum was granted in 404 cases, yielding an approval rate of approximately 22.1%. ROA.8513. This rate is significantly lower than the 31–39% IJ approval rate on asylum claims that started as credible fear screenings from FY 2017-2021. 87 Fed. Reg. at 18116 n.57. Thus, again, the district court correctly concluded that "[a]sylum

[3] Even before the IFR took effect, asylum officers decided asylum claims in some circumstances, such as in affirmative asylum claims. *See* 87 Fed. Reg. at 18080 ("USCIS asylum officers conduct credible fear interviews, make credible fear determinations, and determine whether an [alien]'s affirmative asylum application should be granted."); 87 Fed. Reg. at 18111 ("Determining asylum eligibility and vetting is already a necessary part of the day-to-day work of a USCIS asylum officer and will continue to be so after this rule takes effect."); s*ee also* 8 C.F.R. §§ 208.2(a), 208.9(a), 208.30.

... grant rates in the United States have gone down since the implementation of the Asylum IFR." ROA.12918.

Appellants do not dispute the data nor the accuracy of the court's conclusion that both credible fear rates and asylum grant rates *decreased* following the implementation of the IFR. Instead, Appellants complain that the district court "latched on to" *rates* rather than raw data and argue doing so was improper. App. Br. at 28. In Appellants' view, the raw data shows that migration is increasing and thus "the only plausible conclusion is that" the IFR will lead to more aliens released in their states. App. Br. at 28. But Appellants are incorrect that there is evidence in the record showing increased migration following the implementation of the IFR. *See supra*. Further, in a factual attack, Appellants must show more than plausibility; Appellants must prove actual or imminent harm. The district court did not clearly err in finding they failed to do so.

Moreover, the district court considered asylum grant rates because that was the metric upon which the Appellant States based their alleged injury in the complaint. ROA.2182-2183 at ¶ 3 ("The entirely predictable result will be a substantial increase in the approval rate of non-meritorious asylum claims."). Appellants' theory was that an increase in the asylum grant rate would be the driver of an increase in unlawful migration. *Id*. ("[T]he increase in asylum approval rates

will incentivize even higher rates of illegal immigration into the United States."). By comparing the grant rates, the district court was able to isolate the effect of the IFR.

The district court properly observed that ""harm" in the immigration context is understood and evaluated as 'relative to the status quo, and relative to Plaintiff's position absent the challenged policy.'" ROA.12917 (quoting *Texas*, 722 F. Supp. 3d at 707) (explaining that the baseline for these analyses is not zero immigration; rather, the "increase" in unlawful immigration is relative to immigration levels prior to either the enactment or termination of the regulation at issue). It is thus unsurprising that in evaluating the effects of agency action, courts routinely consider rate changes. *See*, *e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 753 (2019) (considering census response rates between racial groups); *Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023) (considering whether diverting funds from the border wall increased the rate at which aliens are detected and apprehended at the border); *Tenth St. Residential Ass'n v. City of Dallas, Texas*, 968 F.3d 492, 502 (5th Cir. 2020) (considering the increased rate of home demolitions following a housing ordinance); *Texas v. Biden*, 589 F. Supp. 3d 595, 621 (N.D. Tex. 2022) (considering the rate at which unaccompanied alien children came across the border following the CDC's order temporarily excepting such children from a final rule pertaining to covid immigration policy). In sum, the district court properly considered the fact that the rate of positive credible fear and asylum grants decreased following the IFR.

Appellants cite other decisions from this Court finding standing to challenge immigration policies. *See* App. Br. at 22-23, 34 (citing *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ("DAPA" case); *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021), *as revised* (Dec. 21, 2021), *rev'd and remanded*, 142 S. Ct. 2528 (2022) ("MPP" case); and *Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) ("DACA" case)). But those cases involved different evidence from what the States have been able to proffer here.

In the DAPA case, this Court found that the plaintiff States had standing because if the program went into effect, it would enable at least 500,000 undocumented aliens in Texas to become eligible for State-funded benefits. 809 F.3d at 155. Thus, "DAPA would have a major effect on the states' fiscs." 809 F.3d at 152-153. In the Migrant Protection Protocols ("MPP") case, this Court found that the plaintiff States had standing to challenge the termination of MPP based upon the district court's factual finding that "MPP's termination has increased the number of immigrants paroled into Texas," 20 F.4th at 970, thereby resulting in increased costs to the State, *id.* at 970-72 (finding standing where the challenged action "increased the number of parolees in the state" overall). In the DACA case, this Court found the plaintiff States had standing to challenge the DACA program because there was evidence in the record that "if DACA were no longer in effect, at least some recipients would leave, and their departure would reduce the State's Medicaid, social

services and education costs." 50 F.4th at 520. In each of those cases, this Court based standing on the same rationale: clear evidence of more aliens in the State who qualify for State sponsored programs, meant more costs.[4]

Such a clear chain of causation and injury is absent in this case. *See Clapper v. Amnesty International USA,* 568 U.S. 398, 409 (2013) ("threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient."). Here, the evidence shows that the IFR's asylum adjudication provisions did not lead to an increase in migration to the United States, result in more asylum grants than before the IFR existed, lead to more individuals residing in the States and utilizing State services than absent the IFR, or injure the States in any way. Indeed, early in this case, the States conceded, "if grant rates are flat or declined," or there is no evidence that "asylum recipients" are residing in Florida or Louisiana, then "the Plaintiff States will have a much more difficult hill to climb" to establish standing. ROA.2167. In fact, the States said they "would seriously consider voluntarily dismissing this suit" in these circumstances. *Id*. Because the States have failed to show increased grant rates or asylees in these two States, the district court properly dismissed this case for lack of standing, and there is no basis for this Court to find clear error in the district court's findings.

---

[4] Appellees dispute that standing was properly established in these three cases or that standing can be based on the presence of more people in a State alone. *See Arpaio,* 27 F. Supp. 3d at 202.

**(ii) Appellants did not establish that they suffered increased costs as a result of the IFR**

Louisiana and Florida also alleged injury in the form of costs incurred from providing various governmental services to the additional aliens they claimed would be in their States because of the IFR. Appellants claim they established pocketbook injuries from education, healthcare, and law enforcement services provided to or on behalf of aliens paroled under the IFR, and FITAP, SNAP, TANF, and Medicaid benefits provided to asylees who were granted asylum because of the IFR. But the States failed to provide such evidence.

Instead of pointing to data related to injuries allegedly sustained because of the IFR, the States discuss costs they have sustained from *other* policies they have challenged in other litigation. Indeed, in the first paragraph of the section of their brief addressing their alleged costs, Appellants do not discuss costs demonstrated in this case, but instead those at issue in MPP. App. Br. at 21. But contrary to Appellants' unsupported assertion, this case is not "on all fours with" MPP. *Id*. On the contrary, in MPP, this Court found that the plaintiff States had standing to challenge the termination of MPP based upon the district court's factual finding that "MPP's termination has increased the number of immigrants paroled into Texas," 20 F.4th at 970, thereby resulting in increased costs to the State, *id*. at 970-72 (finding standing where the challenged action "increased the number of parolees in

the state" overall). Here, there is no evidence that the IFR increased the number of aliens in Florida or Louisiana.

Appellants compare this case to *General Land Office ("GLO") v. Biden*, 71 F.4th 264, 268 (5th Cir. 2023). They argue that *GLO* stands for the proposition that "the additional costs of issuing driver's licenses, educating, providing, healthcare, and criminal-justice processing" "are readily cognizable" and sufficient for establishing injury. App. Br. at 22. But *GLO*—which did not present a factual attack on standing—did not dispense with the States' obligation to establish that they actually incurred "additional costs." They do not establish such here. Nowhere in their brief do Appellants identify any evidence that any category of expense—whether healthcare, education, law enforcement or otherwise—has increased following the passage of the IFR. That data is simply not part of the record.

Yet Appellants claim that "the States submitted evidence to that [] effect." App. Br. at 24. In support of this contention, they cite the Record on Appeal at pages 10204-10208. *Id.* But those pages consist of the December 5, 2023 deposition testimony of Rodney Scott (the former chief of the Border Patrol and current CBP commissioner) speaking about the complexities of migratory trends. This testimony does not consist of evidence that Florida or Louisiana incurred any increase in State expenditures because of the IFR. *Id.* Indeed, Mr. Scott testified he had no such data:

> Q: So, is it fair to say that you don't have any firsthand knowledge of financial losses, alleged financial losses

> sustained by any of the Plaintiffs states as a result of the Asylum Officer Rule?
> A. I don't have that information, no.

ROA. 10193.

> Q: You don’t have any statistics to point to that to show what the effects of the [IFR] have been in the real world?
> A. [] No.

ROA. 10194-95.

And while Appellants also cite to Mr. Scott’s testimony for the proposition that the IFR led to the release of more aliens into the States, the pages of the Record on Appeal that they cite, ROA.10172 and ROA., App. Br. at 24, do not contain such evidence. Those pages consist of testimony whereby Mr. Scott relays hearsay statements by unnamed “staff members,” made before the IFR was implemented, wherein the speakers allegedly expressed concerns that the IFR would increase unlawful migration. ROA.10172; ROA.10219-10220. When asked whether he had any data that the IFR resulted in the release of more aliens than had the rule not been in effect, Mr. Scott conceded he did not.

> Q: [] [D]o you have an understanding that more individuals have been released under the Asylum Officer Rule that would have been released had the rule not existed?
> A. I do not have that specific data.

ROA.10166.

<u>Education</u>

Both Florida and Louisiana claimed the IFR caused their States to spend more on education. ROA.2182-2183 at ¶ 3, 2198-2199 at ¶¶ 69, 70. But there is no evidence of this. At the outset, only single adults were processed under the first implementation of the IFR. ROA.8512. Moreover, while Florida points to data showing that it spends $4,587 per child attending public school and pays additional money for children requiring English as a second language instruction, App. Br. at 26, Florida conceded in discovery it has no idea if any of the children for whom it has made such payments were processed under the IFR. ROA.9161-9162, at ¶¶ 2-3. Nor can this conclusion be reached by inference drawn from an overall increase in Florida's education expenditures prior to and following the IFR because Florida produced no evidence of any such increase.

As for Louisiana, while they claim that they allocate $4,015 per student and pay additional sums to educate non-English speaking children, App. Br. at 25, Louisiana admits it does not track the data necessary to know whether any children educated in Louisiana were either granted asylum or paroled under the IFR. Louisiana concedes it does not track the citizenship status of students. ROA.8806-8807.

Moreover, Louisiana's own documents demonstrate that the number of children educated in public schools in the State has *decreased* since the IFR was

implemented. ROA.8837-8845.[5] Appellants argue that the district court impermissibly concluded from this decrease that Louisiana did not "actually incur[] additional expenses in the area of education as a result of the Asylum IFR." App. Br. at 29 (quoting ROA.12922). According to Appellants, the district court's conclusion was improper because the decrease in Louisiana's education expenses was the result of a population decrease not the IFR. App. Br. at 29. The problem with Appellants' argument is two-fold. First, they did not proffer any evidence to show that the decrease in their education expenditures was caused by a decrease in the State's juvenile population. Indeed, Appellants do not cite the Record on Appeal for that statement, but rather extra-record evidence consisting of newspaper articles that constitute hearsay and were never produced as part of discovery. Second, regardless of the cause, the fact remains that Louisiana spent less on education following the IFR than it did before it. Louisiana cannot claim injury in such circumstances unless

[5] These documents show the following numbers of students were educated before and after the March 2022 IFR: Feb. 2019 - 717,109; Oct. 2019 – 719, 812; Feb. 2020 – 716,416; Oct. 2020 – 699, 625; Feb. 2021 – 697,337; Oct. 2021 – 690,092; Feb. 2022 – 686,337; Oct. 2022 – 685,606; Feb 2023 – 683,518. Thus, since the IFR was implemented, Louisiana has seen a decrease of 2,819 students. ROA.8837-8845.

it could show that but for the IFR the decrease in expenditure would have been even greater. But Louisiana made no attempt to do so.

Economic assistance, healthcare, and victims' services. Louisiana and Florida claim they have suffered costs associated with providing services through SNAP and TANF.[6] ROA.2219-2220 at ¶ 128. The States also claimed that they would incur costs from the IFR with respect to Medicaid and emergency Medicaid. ROA.2193, 2208 ¶¶ 43, 96-97. But neither State produced data showing that they sustained costs associated with SNAP, TANF, Medicaid, or emergency Medicaid on behalf of aliens processed under the IFR. So while Florida points to data that it has "3,000 to 8,000 aliens receiving emergency medical services every month, and Florida's share is anywhere from $1,000,000 to $6,000,000 every month," App. Br. at 26, Florida conceded it has no idea if any of these individuals were processed via the IFR, much less that more aliens were processed via the IFR than would have been processed under existing law. ROA.9161-9162 at ¶¶ 4, 5. Likewise, as to SNAP benefits. Florida notes that it spends $2.17 per alien, per month, for each SNAP recipient, App. Br. at 32, but that data is relevant only if Florida can show that some of those recipients were processed under the IFR and that the total SNAP expenditure increased after the IFR was implemented. Florida does not have data for either

[6] The program in Louisiana is called Financial Independence Temporary Assistance Program ("FITAP").

proposition. Florida stipulated that it does not track the information necessary to determine which, if any, individuals receiving SNAP, TANF, Medicaid or emergency Medicaid were released pending their application for asylum or granted asylum under the IFR. ROA.9161-9162 at ¶¶ 4, 5. Both States also conceded that the federal government fully funds both SNAP and TANF. ROA. 8832-8834; ROA.8811; ROA.8815.[7]

In fact, few aliens paroled under the IFR are even eligible for SNAP, TANF or Medicaid benefits. Most aliens paroled into the country under 8 U.S.C. § 1182(d)(5)—whether under the IFR or otherwise—are not eligible for SNAP, TANF, or Medicaid benefits for five years after entering the country.[8] ROA.8486

[7] The federal government also covers the States' administrative costs associated with TANF, and thus the States have no net injury. ROA.8811 at 69:1-9. As to SNAP, the States pay 50% of the administrative costs associated with the program. *Id.*; ROA.8810 at 68:12-16. As neither Louisiana nor Florida has shown that any of their administrative costs have increased overall because of providing benefits to aliens processed under the IFR.

[8] Aliens from Colombia, Peru, the Dominican Republic, Ecuador, Brazil, and Nicaragua—who make up the majority of individuals who received asylum merits interviews under the IFR —are not eligible for SNAP, TANF or Medicaid benefits regardless of if or how long they have been released on parole. *See* https://www.dhs.gov/immigration-statistics/special-reports/asylum-processing-rule-report. While Cubans and Haitians paroled into the United States under the IFR may be eligible for SNAP, TANF and Medicaid benefits, that was likewise true before the IFR. The States have not demonstrated that more Cubans and Haitians have been paroled into the country and reside in Florida and Louisiana since the IFR was implemented, or that any such individuals received SNAP, TANF or Medicaid benefits. *Id.*

citing Florida Noncitizen Guide[9]; ROA.8835; ROA.8819-8821. The IFR was not in effect for even close to five years before it was paused. And, of course, nothing requires parole to be granted to those aliens. Appellants argue that the district court made too much of the fact that few parolees released under the IFR are even eligible for SNAP, TANF or Medicaid, because "that ignores that the asylees—unlawfully granted asylum under the Rule—*are* entitled to those benefits out of the States' wallets." App. Br. at 33. Appellants' argument is incomplete and flawed.

First, their argument is contingent upon the proposition that aliens with non-meritorious asylum claims have been granted asylum. The fact that any State's costs might rise based on the presence of additional aliens who were properly granted asylum would not constitute a cognizable injury. *See, e.g.*, *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015). But Appellants submitted no evidence that any non-meritorious claims were granted. Second, while aliens granted asylum under the IFR are eligible for SNAP, TANF and Medicaid benefits, that was true for asylees even before the IFR was implemented, and, as set forth above, asylum grant rates decreased, not increased, during the relevant period of time the district court was considering. And with one limited exception discussed below, Appellants did not demonstrate that anyone granted asylum under the IFR

[9] Available at https://www.fns.usda.gov/snap/eligibility/citizen/non-citizen-policy

received SNAP, TANF or Medicaid benefits. ROA.8836; ROA.9161-9162 ¶¶ 4, 5; ROA.8822; ROA.8825-8826.

The same is true as to emergency Medicaid. While emergency Medicaid is available regardless of immigration status, the States have not shown that they have made emergency Medicaid expenditures for anyone in their States because of the IFR. ROA.9161-9162 at ¶ 4. Florida claims that it showed that a single person granted asylum under the IFR received medical benefits totaling $532.29, and that such benefits constitute an injury. App. Br. at 32-33. Not so. Putting aside the fact that Florida made no such proffer to the district court, ROA.9188-9240, it is not enough for Florida to show that it incurred costs from a single person who was granted asylum under the IFR. Florida would have to show that the asylum grant was non-meritorious and that it would not have incurred the expense but for the IFR. That is because injury is not considered in a vacuum. In other words, the court does not compare the costs from a program against a baseline of zero. *Texas v. Dept. Homeland Security*, 722 F. Supp. 3d 688, 707 (2024).

An injury necessarily implies that some situation has gotten worse for the plaintiff relative to the status quo ante. *In re Gee*, 941 F.3d 153, 163 (5th Cir. 2019) ("To the extent the challenged regulations require Plaintiffs to do what they've already been doing [], they do not have standing to challenge them."); *Smith v. GC*

*Servs. Ltd. P'ship*, 986 F.3d 708, 711 (7th Cir. 2021) (plaintiff lacked standing where she was no worse off than if the challenged action had not occurred).

A plaintiff thus cannot show standing where the "present costs and burdens" existed "even before" the challenged policy "was enacted." *Clapper*, 568 U.S. at 416-17. In *Clapper*, the Supreme Court compared costs and burdens both prior to and following enactment of a policy, indicating that courts are not limited to considering whatever prospective costs a plaintiff alleges in isolation. *Id*. Because an injury for standing purposes requires some negative change compared to the status quo ante relative to the plaintiff, there is no such thing as injury from a program in the abstract. *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("We know of no precedent for the proposition that . . . a plaintiff . . . retains standing to challenge . . . [a] regulation in the abstract[], apart from any concrete application that threatens imminent harm to his interests."). A standing argument premised upon increased enforcement costs "is necessarily contingent on a finding that the Final Rule will increase [the State's] enforcement costs," which the State fails to establish where it does not show that the challenged rule would lead to increased enforcement or that such costs would not be offset. *Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 881 (5th Cir. 2023). Thus, Florida's contention that it incurred an injury from the IFR because it made emergency Medicaid expenditures on behalf of an asylee processed

through the program is meritless because there is no basis to conclude that this alien would not have received asylum absent the IFR.

As for Louisiana, it claims that it identified "380 asylum claimants that received SNAP benefits from March 2020 to June 2023." App. Br. at 32, citing ROA. 11022. But the district court correctly noted that "Louisiana is unable to show that any of these 380 asylees . . . were processed under the Asylum IFR, and indeed, many of them most assuredly were not, given that the Asylum IFR did not go into effect until March 2022. Furthermore, Louisiana acknowledges that the federal government fully funds both SNAP and FITAP. As such, with respect to the benefits themselves, these costs are not expenditures of the state." ROA.12920. Mr. Andrew Arthur, Louisiana's 30(b)(6) witness, also testified that Louisiana does not track the information necessary to determine which, if any, individuals receiving SNAP, TANF, Medicaid or emergency Medicaid were released pending consideration of their application for asylum or granted asylum under the IFR. ROA.8812-8814, 80:9-16; ROA.8816-8818; ROA.8827.

Critically, Louisiana failed to show that any expenditures on emergency Medicaid for individuals paroled or granted asylum under the IFR have increased their overall expenses because of the IFR. Put differently, Louisiana has not shown that their costs associated with SNAP, TANF, Medicaid, or emergency Medicaid are different than what they would have been in the absence of the IFR. Afterall, even

before the IFR, aliens were processed for asylum, some were paroled and some were granted asylum—and thus some were eligible for SNAP, TANF, Medicaid, or emergency Medicaid benefits. To satisfy Article III, monetary costs must be "concrete … particularized ... actual or imminent." *Lujan*, 504 U.S. at 560. They must be "real." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

Drivers' licenses. Florida claimed an injury from the issuance of driver's licenses. ROA.2208 at ¶ 97. Not only does Florida lack evidence that paroled asylum seekers have applied for drivers' licenses, ROA.9165-9168, it also cannot claim a cost regardless because the evidence shows Florida nets income from issuing licenses. Florida is charged $25 a month to access the SAVE identity-verification system for aliens and 50 cents for each verification, *id.*, but recoups these costs and generates millions of dollars more by charging those aliens $25 for each identification card, *id.*, and $48 for each driver's license, *id.*

It is not surprising that neither Florida nor Louisiana can show that they have incurred fiscal injuries because of the IFR. Asylum officers out of the Miami Field Office granted asylum to *only 56* aliens the *entire time the IFR was operational* (at the time the motion was heard by the district court), which, as explained above, is fewer than would have been expected absent the IFR. As for Louisiana, only 6 AMIs were conducted out of the New Orleans field office, and *none* resulted in the grant of asylum. ROA.8516-8517. This means the IFR did not lead to any aliens in

Louisiana gaining the ability to settle in the United States permanently, which on its own dooms Louisiana's standing bid.

Any attempt by Appellants to establish standing is further undermined both by the fact grants of relief were lower in AMI cases under the IFR and that by decreasing processing times, individuals who are denied asylum may be removed from the country more quickly. ROA.8519 (describing Median Processing Times for AMIs). The fact that the IFR was intended to reduce—likely by years—the time aliens without meritorious asylum claims can spend in the United States likely reduces State costs associated with such populations. Of course, the IFR has not been operational in two years, and the Departments are in the process of rescinding it, *see* Dkt. 123, Ex. 1, Dkt. 147, rendering the States' speculative claim of impending injury totally without basis.

**B. The States Cannot Show Traceability**

Even if the States could show increased numbers of aliens in their States and increased costs following the IFR, the States made no effort to show that such costs were traceable to the IFR. Indeed, the States have alleged in other litigation that these costs are a result of *other* programs. *See Florida*, 660 F. Supp. 3d 1239 (Florida alleged that increased costs to education and other social service programs were the result of the parole plus ATD policy); *Texas*, 722 F. Supp. 3d 688 (Florida and Louisiana alleged that increased costs were attributable to the Cuban, Haitian,

Nicaraguan, and Venezuelan parole programs); *Texas v. Biden*, No. 3:22-cv-00780 (N.D. Tex.), ECF 141-1 at 3-5, 11-13 (alleging that these costs are the result of the Central American Minors Program).

Appellants argue that "[t]he district court [] mistakenly applied an overly stringent standard of causation, mandating the States prove other policies *did not* cause the massive influx of illegal immigrants." App. Br. at 2. They argue that under "Fifth Circuit precedent [] Plaintiffs are under no obligation to disaggregate injuries simply because they are multi-causal." App. Br. at 16. The only case they cite in support of this statement is *Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021). *Id*. at 2. There are several problems with this argument.

The district court did not require the States to prove that "other policies did not cause the massive influx of illegal immigrants." The district court required the States to show that the IFR "contributed" to the States' alleged injury. ROA. 12926. That is the definition of traceability. *See Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) ("Mississippi … was required to demonstrate that the state will incur costs *because of* the DACA program.") (emphasis added).

This Court did not suggest otherwise in *Texas*. In *Texas*, this Court found standing based on the district court's conclusion that the termination of MPP caused an increase in the number of aliens paroled into Texas, and that it was foreseeable that some of these aliens would apply for driver's licenses. *Texas*, 20 F.4th at 971.

This Court did not dispense with traceability. And critically, here, there has been no finding that the IFR has caused an increase in aliens in Florida or Louisiana.

Traceability required the States to show that the IFR contributed to their alleged injury. They did not do that. In fact, the States conceded that they do not track data concerning expenditures on aliens in a way that would permit them to trace those expenditures to the IFR. ROA. 9161-9162 at ¶¶ 3-5; ROA.8804-8805 (education costs), ROA.8812 (SNAP and TANF costs); ROA.8822-8824, ROA.8828 (Medicaid costs); ROA.8828-8829 (admitting Louisiana does not know how many, if any, individuals processed under the IFR in Louisiana would have remained and settled in the state)). The district court was thus correct to hold that the States failed to meet their burden absent evidence directly demonstrating some connection between the IFR and costs. *See Arpaio v. Obama*, 797 F.3d 11, 22 (D.C. Cir. 2015); *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1015 (9th Cir. 2021); *Arizona v. Biden*, 31 F.4th 469 (6th Cir. 2022).

### C. The States Cannot Show Redressability

The States also failed to demonstrate that their alleged injuries were redressable. "To establish standing, a plaintiff must show an injury in fact caused by the defendant and *redressable by a court order*." *Priorities*, 143 S. Ct. at 1970 (emphasis added) (citing *Lujan*, 504 U.S. at 560–561). The Court's judgment must actually "remedy the plaintiff's harms." *Id.* at 1979. "[R]elief that does not remedy

the injury suffered cannot bootstrap a plaintiff into federal court." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019).

Without an actual, traceable injury, there is no targeted relief a court can provide. "To establish redressability, a plaintiff must show from the outset of its suit that its injuries are capable of being remedied by a favorable decision." *Texas*, 143 S. Ct. at 1978 (Gorsuch, J., concurring) (cleaned up). Enjoining or vacating the IFR would not redress the States' alleged injuries. Even without the IFR, federal officials, including IJs, would retain the authority and discretion to grant asylum to aliens. Because the evidence shows that asylum officers granted asylum under the IFR no more frequently than IJs, removing the IFR would not redress their alleged harm.

Likewise, regarding the States' challenge to the IFR's parole provision, even absent that authority, DHS would still retain the authority to parole aliens seeking asylum under section 1182(d)(5)(A), which covers all applicants for admission. Enjoining the IFR thus would not restrain the Executive's discretion over processing migrants at the border. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105-06 (1998) (finding no redressability where relief sought would not address the harms suffered).

Moreover, enjoining or vacating the IFR now would be meaningless. The IFR has not been operational since June 6, 2024, and the Departments are rescinding it. And even if the IFR were operational, enjoining or vacating it would not prevent

aliens who are already seeking asylum from choosing to remain in Louisiana or Florida. Instead, an injunction or vacatur of the IFR would merely remove a tool for quickly removing certain aliens who lack a lawful basis for remaining in the United States and similarly remove a disincentive for aliens to illegally cross into the country without a legitimate asylum claim—*i.e.*, placement into expedited removal of aliens who could not previously be processed for expedited removal due to operational constraints. 87 Fed. Reg. at 18108-19. Similarly, enjoining or vacating the IFR would not prevent paroled aliens from residing in, or relocating to, Appellant States.

Appellants also claim that "redress is especially likely given the violation of the States' procedural rights." App. Br. at 40. But Appellants do identify those procedural rights. Further, the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in vacuo—is insufficient to create Article III standing." *Summer v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009). Appellants failed to demonstrate a concrete injury from the IFR and thus would still lack standing even if they had identified the violation of any procedural right.

Redressability is also lacking because 8 U.S.C. § 1252(f)(1) bars courts other than the Supreme Court from enjoining or restraining the operation of section 1225(b)(1), which the IFR implements. That statute provides that "no court (other

than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter," including 8 U.S.C. § 1225, "other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022). Enjoining the government's chosen means of implementing the credible fear-screening procedures of section 1225(b)(1) would "order" Defendants "to refrain from taking actions to … implement" that section and therefore violate section 1252(f)(1). *See id.* Because this is the relief the States seek, and the Court is prohibited from granting it, Appellants cannot obtain adequate redress and lack standing.

### D. The States are not entitled to special solicitude

The States argue that "[s]pecial solicitude tips the scales even further" in favor of finding standing. App. Br. 38. Even if the doctrine persists, it at most lowers the threshold for establishing redressability. *Id.* at 517-18; *DACA*, 50 F.4th at 514. But a looser standard for redressability cannot overcome the failure to establish concrete harm. It is, therefore, of no use to Florida and Louisiana, which are alleging indirect,

unsubstantiated costs that are insufficient to satisfy "bedrock Article III constraints." *Priorities*, 599 U.S. at 680, n.3; *see Florida v. Mellon*, 273 U.S. 12, 17-18 (1927).

In *Priorities*, the Supreme Court confirmed that special solicitude has no application when a State asserts standing based on the type of indirect costs Florida and Louisiana assert here. 599 U.S at 674. The majority noted that plaintiffs based "part of their argument for standing" on *Massachusetts v. EPA*, 549 U.S. 497 (2007), but nonetheless held that "none of the various theories of standing asserted by the States … overcomes the fundamental Article III problem with this lawsuit." *Priorities*, 599 U.S. at 680 n.3, 685 n.6. Indeed, the majority clearly stated that *Massachusetts* "does not control this case," *Id.* at 685 n.6, a point the concurrence also noted while explaining the limited historical application of the doctrine overall. *Id.* at 688-89 (Gorsuch, J., concurring).

The Supreme Court has never afforded States "special solicitude" in any other case. Since applying special solitude in *Massachusetts*, the Court's decisions have consistently analyzed State standing without granting States more favorable treatment simply because they are States. *See, e.g., California v. Texas,* 141 S. Ct. 2104, 2116-20 (2021); *Trump v. New York*, 141 S. Ct. 530, 534-37 (2020) (per curiam); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019).

*Massachusetts*, in contrast, involved a direct harm to a State, namely the threatened loss of territory. *Massachusetts*, 549 U.S. at 521. The Supreme Court has

long treated the loss of territory as a distinct and legally cognizable harm. *See* Ann Woolhandler & Michael G. Collins, *State Standing*, 81 Va. L. Rev. 387, 415–16 (1995) (discussing 19th-century cases).

Special solicitude also does not apply because a state invoking special solicitude must show a procedural right to challenge the action in question. *DACA*, 50 F.4th at 514; *Priorities*, 599 U.S. at 685, n.6 (noting that in *Massachusetts*, "[t]he issue there involved a challenge to the denial of a statutorily authorized petition for rulemaking," rather than a challenge to an exercise of the Executive's discretion). The INA creates no similar procedural right. Appellants claim their alleged injuries are redressable "given the violation of the States' procedural rights," App. Br. at 40, but never explain what procedural right they claim has been violated. None has been.

### E. The States claimed injury is not judicially cognizable

In *Priorities*, the Supreme Court held that two states lacked standing to challenge DHS's discretionary immigration enforcement priorities because their alleged injury—indirect costs associated with having more aliens in their States—was not "legally and judicially cognizable." *Priorities*, 599 U.S. at 670, 676. The Supreme Court has also held federal courts should "chiefly" evaluate standing "by comparing the allegations of the particular complaint to those made in prior standing cases." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 384 (2024) ("*AHM*") (quotation omitted).

Here, the States allege the same type of injury as in *Priorities*. *Compare* ROA.2193 at ¶ 43 (alleging Appellants will spend "money on healthcare, detention, and other services that would otherwise not have to be spent") and ROA.2198 at ¶ 69 (alleging Appellants will have to spend money on education for alien children who may come to the United States incentivized by the IFR), *with Priorities*, 599 U.S. at 670 (alleging harm from costs to "supply social services such as healthcare and education to [aliens] who should be (but are not being) arrested by the Federal Government"). Thus, even if Appellants could show that they incurred social service costs from the IFR, *Priorities* reaffirms that when a theory of harm is based solely on such costs, standing is substantially more difficult to establish.

More recently, in *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 392 (2024) ("*AHM"*)—where the Supreme Court unanimously held that doctors and medical associations lack Article III standing to challenge the FDA's decisions to relax certain regulatory requirements—the Supreme Court rejected a theory of standing premised on attenuated, indirect injuries. The Court compared the plaintiffs to firefighters challenging building codes that increase fires, police officers challenging legislation associated with increased crime, and "[t]eachers in border states" suing "to challenge allegedly lax immigration policies that lead to overcrowded classrooms." 602 U.S. at 393. The Court rejected standing in these scenarios. *Id*. A contrary holding would lead down a path where "every citizen had

standing to challenge virtually every government action that they do not like," *id.*at 392, and improperly draw courts into all sorts of generalized grievances.

Like the plaintiffs in *Texas* and *AHM*, the Appellants are third parties who are not regulated by the rule they challenge. The Supreme Court has consistently held that "when the plaintiff is not himself the object of the government action or inaction he challenges," plaintiffs face a "substantially more difficult" burden to establish standing. *AMH*, 602 U.S. at 382; *see Priorities*, 599 U.S. at 680 n.3.

Following *Priorities* and *AMH*, a State may not simply argue that some change in federal policy may cause a change in population that may cause State expenditures on social services. *Priorities*, 599 U.S. at 680, n.3. When faced with an identical theory of harm, the Supreme Court found the plaintiffs lacked standing. *Id*.

This case mirrors *Priorities* in three crucial respects: it involves a State challenge to the Executive's discretionary decision-making; the States cannot establish any history or tradition of justiciability for their alleged injuries; and the States, like the plaintiffs in *Priorities*, allege only indirect injuries based on the speculative conduct of third parties.

**i. This Case and *Priorities* Concern Policies Vested with Discretion**

Both this case and *Priorities* involve the type of Article II discretion the Supreme Court held prevents finding a cognizable injury. In *Priorities*, the States argued that the memorandum at issue concerned enforcement actions that federal

statutes provided DHS "shall" take. *See* 8 U.S.C. §§ 1226(c), 1231(a)(2). The Supreme Court concluded States lacked standing to challenge the Executive's discretionary choices concerning arrest and prosecution of aliens, notwithstanding certain mandatory language related to detention of aliens in the statute, because decisions on arrest and prosecution have historically been subject to prosecutorial discretion. *Priorities*, 599 U.S. at 678-79, 684. Here, the States challenged (i) regulations governing the process by which asylum officers, in the expedited removal context, provide "further consideration of the application for asylum," 8 U.S.C. § 1225(b)(1)(B)(ii), for individuals who are found to have a credible fear of persecution or torture under 8 U.S.C. § 1225(b)(1), and (ii) the standard under which such individuals may be released on parole, under 8 U.S.C. § 1182(d)(5), during such further consideration. ROA.2179-2249. The statute is silent as to the procedure for providing such "further consideration," thus leaving the determination of that process to the discretion of DHS. *See Morton v. Ruiz*, 415 U.S. 199, 231 (1974). Meanwhile, Section 1182(d)(5) grants the Secretary discretion to grant parole. 8 U.S.C. § 1182(d)(5).

A judicial order that would force the Executive to exercise its discretion in a particular way would interfere not only with the Executive's inherent Article II discretion (as in *Priorities*) but also with the express discretion Congress granted in

the parole statute and implicitly granted by its silence on how to decide asylum claims. Under *Priorities*, the States' challenges are not fit for judicial resolution.

**ii. There is no History or Tradition of Cases Challenging Parole Policies or Based on Similarly Indirect Injuries**

In *Priorities*, the Supreme Court made clear that courts must examine "history and tradition" as "a meaningful guide to the types of cases that Article III empowers federal courts to consider." 599 U.S. at 676. Courts must consider whether the "asserted injury" is the type that has "traditionally" been "redressable in federal court" and determine the dispute is one that "is traditionally thought capable of resolution through the judicial process." *Id.* The States have not established any history or tradition of successful challenges to asylum or parole policies by States or other third parties, or to indirect or attenuated effects of such policies.

There is no historical tradition of anyone, let alone States, challenging grants of asylum. The States have not identified any such lawsuits, and Appellees are not aware of any. The absence of suits like this one is powerful evidence that such suits are incompatible with our constitutional structure, which "contemplates a more restricted role for Article III courts." *Raines v. Byrd*, 521 U.S. 811, 828 (1997); *cf. Haaland v. Brackeen*, 599 U.S. 255, 294-96 (2023) (noting limits on State standing to raise claims against the Federal government). "Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty," and a "State's allegation that defendants have failed to enforce the

immigration laws and refuse to pay the costs resulting therefrom is not subject to judicial review." *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997); *see also Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015) (A "State official has not suffered an injury in fact to a legally cognizable interest" even if "a federal government program is anticipated to produce an increase in that State's population and a concomitant increase in the need for the State's resources" because this is simply a generalized grievance that would improperly "permit nearly all State officials to challenge a host of Federal laws.").

The States have not identified cases showing a historical tradition of courts reviewing disputes between States and the federal government with respect to parole practices. Nor have the States shown that this is the type of dispute that has traditionally been redressable in federal court. Just as plaintiffs in *Priorities* failed to cite any precedent for reviewing Executive policies with respect to arrest and prosecution, here Appellants have not cited a "history or tradition of courts" reviewing or ordering the Executive to change its use of its discretionary parole authority. *Priorities*, 599 U.S. at 677; *cf. Loa-Herrera v. Trominski*, 231 F.3d 984, 991 (5th Cir. 2000) (because the Secretary's "discretionary judgment regarding the application of [conditional] parole [under 8 U.S.C. § 1226(a)(2)(B)]… is not subject to review," "the *manner* in which that discretionary judgment is exercised, and

whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints" is also not subject to review)") (internal citation omitted).

*Priorities* also explained that States will have greater difficulty establishing standing when their theory of harm is based solely on indirect costs that may result from changes in federal policy that could affect a State's population. "[I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on State revenues or State spending," and "when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Priorities*, 599 U.S. at 680, n.3. In such circumstances, "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id.*

The IFR does not direct States to take any particular actions, making any allegations of costs indirect. "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges," plaintiffs face a "substantially more difficult" burden to establish standing. *Lujan*, 504 U.S. at 561; *see also Warth v. Seldin*, 422 U.S. 490, 504-05 (1975) (where "the harm to petitioners may have resulted indirectly" because they are "a third party" not directly regulated by the challenged policy "the indirectness of the injury" may "make it substantially more difficult to meet the minimum requirement of Art. III"). And as the Supreme Court long ago held, an indirect theory of harm based solely on the assertion that a change

in federal policy will affect a State's population and in turn affect State revenue is insufficient to satisfy Article III. *See Florida v. Mellon*, 273 U.S. 12, 17-18 (1927) (rejecting standing where State argued change in federal policy would "have the result of inducing potential taxpayers to withdraw property from the State," negatively affecting State revenue). Such injuries are "at most, only remote and indirect" and insufficient to show the type of more "direct injury" required for standing. *Id*. at 18; *see also Priorities*, 599 U.S. at 680, n.3.

It is no longer sufficient for a State to argue that some change in federal policy may cause a change in population that may cause indirect changes in the State's expenditures on education, health care, law enforcement, or social services. *Priorities*, 599 U.S. at 680, n.3. This is particularly true where the change in federal policy neither directly regulates State entities nor affects federal funding to States. While this theory of injury may have previously been plausible, *see Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023) cited in App. Br. at 2, 19., it is no longer. *See generally Priorities*, 599 U.S. 670; *see also AMH*, 602 U.S. at 392.

Finding standing whenever a change in federal policy might arguably cause some incidental costs to States would allow any State to challenge any change in immigration policy and improperly draw courts into all sorts of generalized grievances. But as numerous courts recognize, "such a 'generalized grievance,' no matter how sincere, is insufficient to confer standing." *Hollingsworth v. Perry*, 570

U.S. 693, 706 (2013) (quoting *Lujan*, 504 U.S. at 573-74); *Arizona*, 31 F.4th at 476 (it would be astonishing "to say that any federal regulation of individuals through a policy statement that imposes peripheral costs on a State creates a cognizable Article III injury."); *Crane*, 783 F.3d at 252 (merely alleging that a particular policy increases "illegal immigration," which will require the State to spend money on social benefits does not confer Article III standing). And courts generally should not consider these types of indirect costs sufficient to satisfy Article III for another reason—because such costs are self-inflicted and traceable to State legislatures. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (rejecting standing where "[t]he injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective State legislatures").

Article III "serves to prevent the judicial process from being used to usurp the powers of the political branches," *Clapper*, 568 U.S. at 408, by preserving the "proper—and properly limited—role of the courts in a democratic society," *Warth*, 422 U.S. at 498. The recent explosion of suits brought by States with conflicting policy views seeking nationwide injunctions against national policies vividly illustrates the need for courts to prevent States from litigating generalized grievances. A theory of standing that would allow any State to sue the federal government any time it changed federal immigration policy merely by saying the change might affect its population would vitiate the rule that "[t]he mere fact that a

State is the plaintiff is not enough" to establish Article III standing unless the State has suffered a concrete harm of the sort that has traditionally "furnish[ed a] ground for judicial redress." *Mellon*, 273 U.S. at 17.

Finally, the decision to implement the IFR involved a "complicated balancing" of various factors, including "inevitable resource constraints and regularly changing public-safety and public-welfare needs." *Priorities*, 599 U.S. at 680. These factors weigh against finding a cognizable injury under Article III. *Id.* Here, the Departments, dealing with difficult questions related to how to use limited resources, created the IFR to reduce "undue delays in the asylum adjudication system." 87 Fed. Reg. at 18088. Such policy questions are not easily susceptible to judicial resolution because there are no "meaningful standards for assessing those policies," which "explain[s] why federal courts have not traditionally entertained lawsuits of this kind." *Priorities*, 599 U.S. at 680-81 (*citing Heckler v. Chaney*, 470 U.S. 821, 830-32 (1985)); *see also Texas*, 106 F.3d at 667 (noting that 8 U.S.C. § 1103(a) "commits enforcement of the INA to" the Secretary's "discretion" and "is unreviewable under the Administrative Procedure Act because a court has no workable standard against which to judge the agency's exercise of discretion").

**iii. The States' Attempt to Escape the Holding of *Priorities* Fails**

Appellants attempt to distinguish *Priorities* by arguing the IFR is "more than just a non-enforcement policy" and instead confers legal benefits upon aliens. Appl.

Br. at 46. But the Supreme Court noted that "a challenge to an Executive Branch policy that involves *both* the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis," and reserved resolution of that question for another day. 599 U.S. at 683 (emphasis in original). Because no one claims this case involves arrest and prosecution policies, there is no basis to invoke an exception the Supreme Court said could potentially be relevant in challenges to such policies. *Id.*

Additionally, the IFR does not provide affirmative benefits as Appellants summarily claim. Section 1182(d)(5)(A), not the IFR, provides potential eligibility for parole. Section 1182(d)(5)(A) parole existed before, and would exist without, the IFR. The IFR merely changes the procedure for adjudicating a limited number of asylum claims, but does not alter the standard or provide substantive rights. There is thus no basis to argue that more individuals are eligible for a benefit becuase of the IFR.

Appellees anticipate that Appellants may argue that the Laken Riley Act, 8 U.S.C. § 1225(b)(3), which provides that a State attorney general or other authorized State officer alleging a violation of the detention or removal requirements under § 1225(b)(1) or (2) that harms the State or its residents "shall have standing" to sue the Secretary of Homeland Security for "appropriate injunctive relief." Laken Riley

Act, Pub. L. No. 119-1, § 3(a), 139 Stat. 3, 4 (2025). But the States cannot rely upon the Laken Riley Act, nor would it help them here even if they could.

First, standing is evaluated at the time of the filing of the operative complaint. *Lujan v*, 504 U.S. at 560–61; *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004); *Davis v. F.E.C.*, 554 F.3d 724, 734 (8th Cir. 2008); *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013). The Laken Riley Act was signed into law January 29, 2025. Appellants filed their Amended Complaint on May 6, 2022, years before the Laken Riley Act was passed. Appellants cannot rely upon it for standing. And it would not help them even if they could. The Laken Riley Act provides statutory standing to sue, but a plaintiff who has statutory standing to sue must still meet the Article III standing requirements—injury in fact, causation, and redressability. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 (1998).

## CONCLUSION

For all these reasons, this Court should affirm the district court's decision.

November 16, 2026

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General
U.S. Department of Justice, Civil Division

AUGUST FLENTJE
Deputy Director
U.S. Department of Justice, Civil Division
Office of Immigration Litigation

*/s/ Elissa Fudim*
ELISSA P. FUDIM
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation,
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-6073
Email: elissa.p.fudim@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding parts of the document exempted by Fed. R. App. P. 32(f) and Fifth Cir. R. 32.1, it contains 12,924 words.

This brief complies with the typeface and the type style requirements of Fed. R. App. P. 35(a)(5)-(6), and Fifth Cir. R. 32.1 because it has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

*/s/ Elissa Fudim*
ELISSA P. FUDIM
United States Department of Justice

## CERTIFICATE OF SERVICE

I certify that on November 16, 2026, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Elissa Fudim*
ELISSA P. FUDIM
United States Department of Justice